# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| YAZMIN GONZALEZ, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | C.A. NO.24-CV-00201-KC |
| LIBERTY BANKERS LIFE | § | |
| INSURANCE COMPANY, an | § | |
| Oklahoma Corporation, | § | |
| | § | |
| Defendant/Third-Party Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| MUHAMMAD SALMAN ALI | § | |
| BALOCH, | § | |
| | § | |
| Third-Party Defendant. | § | |

---

## LIBERY BANKERS LIFE INSURANCE COMPANY'S THIRD-PARTY COMPLAINT (FED. R. CIV. P. 14(a))

---

Pursuant to Federal Rule of Civil Procedure 14(a), Liberty Bankers Life Insurance Company ("Liberty" or "Third-Party Plaintiff") files this Third-Party Complaint against Muhammad Salman Ali Baloch ("Third-Party Defendant" or "Baloch") and in support respectfully shows as follows:

## PARTIES

1.      Liberty is an Oklahoma insurance company with its home office located in Dallas, Texas. At all relevant times, Liberty was, and still is, doing business in Texas within this District.

2.      Third-Party Defendant is an individual residing in San Diego, California and is a citizen of the state of California that Muhammad Salman Ali Baloch can be served with process by serving him at his residence at 5614 Lauretta St., Apt. 6, San Diego, California 92110.

## JURISDICTION AND VENUE

3.      The claims asserted in the complaint in this action arise under a federal statute, the Telephone Consumer's Protection Act ("TCPA"), so this court has subject matter jurisdiction over those claims under 28 U.S.C. § 1331.  The indemnity claim asserted in this third-party complaint against Muhammad Salman Ali Baloch ("Third-Party Defendant" or "Baloch") is so related to the claims asserted in the complaint as to form part of the same case and controversy under Article III of the United States Constitution, so that this court has subject matter jurisdiction over the third-party complaint under 28 U.S.C. § 1367(a).  Moreover, Liberty claims herein that the Third-

Party Defendant is liable to Liberty for the liability that Liberty may owe to Plaintiff and the claim asserted in this third-party complaint arises out of the same facts and circumstances as those of the original complaint so that the court may exercise supplemental jurisdiction over it under the provisions of 28 U.S.C. § 1367(a).

4.      This Court has personal jurisdiction over Third-Party Defendant. Third-Party Defendant is licensed insurance agent in Texas and has been so licensed at all times relevant to the acts alleged by Plaintiff in her Complaint. Third-Party Defendant's Texas insurance license, #3014353, began on June 1, 2023 and expires on August 31, 2025. Third-Party Defendant has represented to Plaintiff that his Texas insurance license is "Active" and Third-Party Defendant intentionally promotes and sells insurance to Texas residents in the forum state.  Further, Plaintiff alleges that Third-Party Defendant solicited her business when Plaintiff was in Texas and Plaintiff's claims, which give rise to Third-Party's obligations for indemnity, arise from or are related to those purported acts.  In other words, the suit arises out of Third-Party Defendant's contacts with the forum.  Third-Party Defendant further consented to having his Producer's Agreement governed by the laws

of Texas, that the forum for any dispute arising out of or related to the Agreement shall be the State of Texas and that he has subjected himself to personal jurisdiction in Texas. *See* the Producer's Agreement, attached as Exhibit 2 at paragraph 28.

5.    Venue in this district is proper under 28 U.S.C. § 1391 (b)(1) because a substantial part of the acts or omissions giving rise to the lawsuit purportedly occurred in this district.

## FACTS

6.    On June 11, 2024, Plaintiff filed a Complaint against Liberty in the above-numbered case, a copy of which is attached hereto as *__Exhibit 1__*.

7.    Plaintiff's Complaint purports to allege claims against Liberty related to Third-Party Defendant's violations of the TCPA which is both a federal consumer protection and a federal telemarketing law.  *See e.g. Exhibit 1* at paragraphs 8 (referring to Third-Party Defendant as an "Unnamed Party," 33-36, 47, 52-60.

8.    At the time of the calls alleged, Third-Party Defendant had a signed Producer's Agreement with Liberty, a true and correct copy of which is attached as *__Exhibit 2__*, in which Third-Party Defendant as "Producer"

agreed, among other things, as follows:

      3.    **DUTIES.** In preforming *[sic]* the Services, Producer shall have the duties set forth in this Section and shall perform such services strictly in accordance with such duties and obligations. In performing the Services, Producer shall promote and safeguard the best interests of the Company; and, in doing so: (i) shall fairly, truthfully, and properly represent the Company and its products and services; and (ii) shall faithfully perform, in an ethical and professional manner, all duties within the scope of the appointment under this Agreement.

In particular, but without limitation, the Producer represents, warrants, and covenants that:

      a.    Producer is aware of, and shall stay current with all applicable laws, rules, and regulations which apply to the Services, including, without limitation, state and federal insurance laws, and agrees to comply with such laws, rules, and regulations, at all times.

                   . . .

      d.    Producer shall become familiar with and agrees to strictly observe and comply with any rules, regulations, policies, procedures, best practices, and requirements set forth from time to time by the Company.

      9.    On the same date, Third-Party Defendant also signed a Producer Telemarketing Acknowledgement, a true and correct copy of which is attached as ***Exhibit 3***, as part of his contracting with Liberty.  Among other

things, it provides that:

> …All reference to "Seller" in this document means You, Your sub-producers, and Your lead vendor. "Call" means all attempted outbound telephone calls or texts, attempted telephone call transfers, and acceptance of telephone call transfers that involve or encourage the potential purchase of, or investment in, property, goods, or services.

> Calls are subject to specific state and federal laws. Federal laws impose disclosure requirements, set permitted hours, and impose other conditions and restrictions. To the extent Seller engages in telemarketing Calls, or hires or permits others to do so on Seller's behalf, Seller must be aware of, and strictly comply with, all federal telemarketing laws and states telemarketing laws related to the Call. For example, the Telephone Consumer Protection Act ("TCPA") is the primary federal law that applies to Calls….

> Seller should **never**: (1) use an automatic telephone dialing system; (2) use a pre-recorded message; or (3) Call numbers on a Do-Not-Call ("DNC") registry – there is a federal DNC registry, some states also have a DNC registry, and the Company has an internal DNC registry available to You on the Company producer portal (or you can request a copy from Compliance@LBIG.com).

> . . .

> By signing below, You hereby acknowledge, understand, and agree:

> - As an independent contractor, it is Your sole and exclusive responsibility to ensure that Seller abides by all federal, state, and local laws, including telemarketing laws.
> - Seller will ensure anyone who works for Seller understands and abides by these same rules.

- You and Your upline will indemnify and hold harmless the Liberty Bankers' company that Seller is acting on behalf of for any and all legal claims related to Seller's violation of consumer protection laws.

10.     Section 19 of the Producer's Agreement provides:

19. **LEGAL ACTION.** Producer has no authority to, and shall not, institute any administrative or legal proceedings on the Company's behalf. If the Company is a party to any administrative or legal action, or both, by reason of an alleged act, fault, or failure by Producer in connection with Producer's acts or omissions, the Company may, in its sole discretion, require the Producer to hire and pay an attorney designated by the Company, in its sole and absolute discretion, to represent the Company. However, at the Company's option, and in its sole discretion, the Company may defend or institute any such action and expend such sums, including attorney fees, expenses and costs as may in the Company's judgment be necessary and the Producer agrees that it shall be liable for and shall reimburse the Company, immediately upon demand, for all such amounts.

*See* Exhibit 2.

11.     Section 20 of the Producer's Agreement states:

20. **INDEMNIFICATION**. Producer agrees to defend (with counsel selected by the Company in its sole and absolute discretion), indemnify and hold harmless the Company, its affiliates and their respective employees, officers, directors and shareholders from any and all claims, actions, liability, damages, expenses, and loss which arise from, result from, or relate to Producer's' real or alleged negligent, willful, or criminal acts, or the

Producer's errors, omissions or breach of any provision of this Agreement and such acts, errors, omissions or breaches of Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf, in the performance of Producer's duties under this Agreement. Claims, liability, or loss includes, but is not limited to, all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense or expenditure incurred by the Company. This indemnification will be in addition to any liability Producer may otherwise have.

*See Id.*

12.     Further, under his Producer Telemarketing Acknowledgment, Third-Party Defendant agreed to "indemnify and hold harmless" the Liberty Bankers' company for any and all legal claims related to his violation of consumer protection laws" (which include the TCPA). *See* Exhibit 3.

13.     Liberty has exercised its option and sole discretion to defend the TCPA Lawsuit by hiring the Firm. Liberty also demanded indemnification from Third-Party Defendant in writing on July 24, 2024. A copy of that letter is attached as ***Exhibit 4***.

14.    Plaintiff's alleged injuries, harm, damages, and actual damages, if any, occurred without any fault or knowledge or willfulness on the part of Defendant Liberty and the recovery, if any, by Plaintiff, on account of the matters alleged in the Complaint was and should be the responsibility of Third-Party Defendant.

15.    All conditions precedent have been performed, occurred, or been waived.

## CAUSES OF ACTION

### COUNT 1:  CONTRACTUAL INDEMNITY—PRODUCER'S AGREEMENT

16.    The foregoing paragraphs are incorporated herein by reference as if set forth at length.

17.    Liberty is a party to this legal action by reason of an alleged act, fault, or failure by Third-Party Defendant in connection with his purported acts or omissions.  Pursuant to Section 19 of the Producer's Agreement, Liberty has exercised its option, and sole discretion to defend the TCPA Lawsuit and institute this Third-Party action and to expend such sums, at the Company's option, and in its sole discretion, including attorney fees, expenses and costs as are in Liberty's judgment necessary.  Third-Party

Defendant has agreed that it shall be liable for and shall reimburse Liberty, immediately upon demand, for all such amounts, but has failed to do so. Accordingly, Liberty herein sues for same.

18.     Further, pursuant to Section 20 of the Producer's Agreement, Third-Party Defendant agreed to indemnify and hold Liberty harmless from any and all claims, actions, liability, damages, expenses, and loss which arise from, result from, or relate to Third-Party Defendant's real or alleged negligent, willful, or criminal acts, or Third-Party Defendant's errors, omissions or breach of any provision of the Producer Agreement and such acts, errors, omissions or breaches of Third-Party Defendant and his, her, or its employees, contractors, agents, and those acting on Third-Party Defendant's behalf, in the performance of Third-Party Defendant's duties under the Producer Agreement this Agreement. Claims, liability, or loss includes, but is not limited to, all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense

or expenditure incurred by Liberty. Further, the indemnification is in addition to any liability Third-Party Defendant may otherwise have.

19.     Accordingly, under Section 20 of the Producer's Agreement, Third-Party Defendant  to the extent Liberty pays any judgment covered by the indemnity, Liberty is entitled to be reimbursed by Third-Party Defendant for breach of the indemnity provisions.  Further, pursuant to the terms of Section 20, Liberty is entitled to recover from Third-Party Defendant all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense or expenditure incurred by the Company.

**COUNT 2:  CONTRACTUAL INDEMNITY
—PRODUCER TELEMARKETING ACKNOWLEDGMENT**

20.     The foregoing paragraphs are incorporated herein by reference as if set forth at length.

21.     Pursuant to the terms of the Producer Telemarketing Acknowledgement, Third-Party Defendant is obligated to indemnify and hold Liberty harmless for any and all legal claims related to Third-Party

Defendant's violation of consumer protection laws—which would include the TCPA.  Accordingly, to the extent Liberty pays any judgment covered by the indemnity, Liberty is entitled to be reimbursed by Third-Party Defendant for breach of the indemnity provisions.  Further, Liberty is entitled to recover from Third-Party Defendant the attorneys' fees and other costs and expenses that it will have incurred to defend any claims related to the TCPA Lawsuit.

## COUNT 3: DECLARATORY JUDGMENT CONCERNING CONTRACTUAL INDEMNITY OBLIGATIONS

22.  The foregoing paragraphs are incorporated herein by reference as if set forth at length.

23.  Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Liberty is entitled to a declaratory judgment, inasmuch as an actual and present controversy exists, that Liberty is entitled to indemnity from Third-Party Defendant for any liability that Liberty may incur to Plaintiff related to Third-Party Defendant's violation of the TCPA in accordance with the Producer Telemarketing Acknowledgment.

24.  Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, and under the terms of Section 20 of the Producer's Agreement, Liberty

is entitled to a declaratory judgment, inasmuch as an actual and present controversy exists, that Liberty is entitled to indemnity from Third-Party Defendant for any liability that Liberty may incur to Plaintiff from any and all claims, actions, liability, damages, expenses, and loss which arise from, result from, or relate to Third-Party Defendant's real or alleged negligent or willful acts in violation of the TCPA and  Third-Party Defendant's errors, omissions and breach of any provision of the Producer Agreement and such acts, errors, omissions or breaches of Third-Party Defendant and his, her, or its employees, contractors, agents, and those acting on Third-Party Defendant's behalf, in the performance of Third-Party Defendant's duties under the Producer Agreement including all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense or expenditure incurred by Liberty. Further, the indemnification is in addition to any liability Third-Party Defendant may otherwise have.

25.     Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Liberty is entitled to a declaratory judgment, inasmuch as an actual and present controversy exists, that Liberty is entitled to indemnity from Third-Party Defendant for the attorney fees, expenses and costs Liberty expended that it determined were necessary to defend the TCPA Lawsuit under the Section 19 of the Producer's Agreement.

26.     Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Liberty is entitled to a declaratory judgment, inasmuch as an actual and present controversy exists, that Liberty is entitled by the terms of the Producer's Agreement and the Producer Telemarketing Acknowledgment to recover from all attorneys' fees, costs, and expenses that Liberty incurs to enforce Third-Party Defendant's indemnity obligations.

**COUNT 3:  <u>COMMON LAW INDEMNITY</u>**

27.     The foregoing paragraphs are incorporated herein by reference as if set forth at length.

28.     Liberty asserts that it is not liable for any damages as alleged by Plaintiff. To the extent that Liberty is held liable to Plaintiff, Liberty is entitled to recovery, reimbursement, and indemnity from Third-Party

Defendant in respect of any damages and claims asserted against Third-Party Defendant.

## COUNT 4: <u>COMMON LAW CONTRIBUTION</u>

29.    The foregoing paragraphs are incorporated herein by reference as if set forth at length.

30.    Liberty asserts that it is not liable for any damages as alleged by Plaintiff. To the extent that any party succeeds with proof of any allegations so that Liberty is held jointly/secondarily liable with Third-Party Defendant, Liberty is entitled to recovery, reimbursement, and contribution from Third-Party Defendant on the basis of Third-Party Defendant's fault.

## <u>PRAYER</u>

Defendant, Liberty Bankers Life Insurance Company demands judgment against Third-Party Defendant Muhammad Salman Ali Baloch:

1.    For indemnity from Third-Party Defendant for any liability that Liberty incurs to Plaintiff in this case, including repayment of any amount paid by Liberty to resolve any such liability;

2.    The attorneys' fees, costs, expenses, and other legal fees, reasonably incurred by Liberty related to its defense of Plaintiff's action and its claims against the Third-Party Defendant and any defenses thereto;

3.    That Liberty be awarded a declaratory judgment that Liberty is

entitled to indemnity from Third-Party Defendant for any liability that Liberty may incur to Plaintiff related to Third-Party Defendant's violation of the TCPA in accordance with the Producer Telemarketing Acknowledgment;

4.      That Liberty be awarded a declaratory judgment that Liberty is entitled to indemnity from Third-Party Defendant for any liability that Liberty may incur to Plaintiff from any and all claims, actions, liability, damages, expenses, and loss which arise from, result from, or relate to Third-Party Defendant's real or alleged negligent or willful acts in violation of the TCPA and  Third-Party Defendant's errors, omissions and breach of any provision of the Producer Agreement and such acts, errors, omissions or breaches of Third-Party Defendant and his, her, or its employees, contractors, agents, and those acting on Third-Party Defendant's behalf, in the performance of Third-Party Defendant's duties under the Producer Agreement including all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense or expenditure incurred by Liberty. Further, the indemnification is in addition to any liability Third-Party Defendant may otherwise have;

5.      That Liberty be awarded a declaratory judgment that Liberty is entitled to indemnity from Third-Party Defendant for the attorney fees, expenses and costs Liberty expended that it determined were necessary to defend the TCPA Lawsuit under the Section 19 of the Producer's Agreement;

6.      That Liberty be awarded a declaratory judgment that Liberty is entitled to a declaratory judgmentthat Liberty is entitled by the terms of the Producer's Agreement and the Producer Telemarketing Acknowledgment to recover from all attorneys' fees, costs, and expenses that Liberty incurs to enforce Third-Party Defendant's

indemnity obligations;

7.      That Liberty recover its reasonable attorneys' fees and costs incurred in enforcing its indemnity obligations under the written indemnity agreements;

8.      That in the event Liberty is held jointly liable with Third-Party Defendant for damages, Liberty be awarded contribution from Third-Party Defendant; and

9.      For all of Liberty's costs of suit; and

10.     That Liberty recover such other and further relief to which it may show itself entitled.

July 24, 2024                              Respectfully submitted,

                                          /s/ Mitchell Madden
                                          Mitchell Madden
                                          State Bar No. 12789350
                                          Email: mmadden@hjmmlegal.com
                                          **HOLMGREN JOHNSON:**
                                          **MITCHELL MADDEN, LLP**
                                          12801 North Central Expressway,
                                          Suite 140
                                          Dallas, Texas 75243
                                          Telephone:  972-484-7780
                                          Facsimile:  972-484-7743

                                          **ATTORNEYS FOR DEFENDANT**
                                          **LIBERTY      BANKERS      LIFE**
                                          **INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2024, I served all parties and counsel of

record in accordance with the Federal Rules of Civil Procedure via CM/ECF.

By:_____/s/ Mitchell Madden_____
MITCHELL MADDEN

Case 3:24-cv-00201-KC   Document 8   Filed 07/24/24   Page 19 of 69
Case 3:24-cv-00201-KC   Document 5   Filed 06/11/24   Page 1 of 2
Case 3:24-cv-00201-KC   Document 4   Filed 06/11/24   Page 1 of 2

**Exhibit**

**1**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Western District of Texas ▼

| | |
|---|---|
| YAZMIN GONZALEZ | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. EP-24-CV-00201-KC |
| LIBERTY BANKERS LIFE INSURANCE COMPANY | ) |
| an Oklahoma Corporation | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Liberty Bankers Life Insurance Company
c/o Northwest Registered Agetn Inc.
1999 Byan St,
Dallas, TX 75201

SP
PSc37b3
6/19/24

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Yazmin Gonzalez
Plaintiff, Pro se
14205 Charles Pollock Ave
El Paso, TX 79938

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:    06/11/2024                                      *Michael S. Trujillo*
                                                                    *Signature of Clerk or Deputy Clerk*

Case 3:24-cv-00201-KC   Document 8   Filed 07/24/24   Page 20 of 69
Case 3:24-cv-00201-KC   Document 5   Filed 06/11/24   Page 2 of 2
Case 3:24-cv-00201-KC   Document 4   Filed 06/11/24   Page 2 of 2

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. EP-24-CV-00201-KC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____          _____

                                                        *Server's signature*

                                          _____

                                                        *Printed name and title*


                                          _____

                                                        *Server's address*

Additional information regarding attempted service, etc:

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| YAZMIN GONZALEZ, | LIBERTY BANKERS LIFE INSURANCE COMPANY an Oklahoma Corporation |

**(b)** County of Residence of First Listed Plaintiff   EL PASO
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   DALLAS
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro se

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [x] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
47 U.S.C 227

Brief description of cause:
Plaintiff received calls in violation of the TCPA

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$18,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE  6/10/24

SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| **YAZMIN GONZALEZ,** §<br>§<br>§<br>**Plaintiff,** §<br>§<br>**v.** §<br>§<br>**LIBERTY BANKERS LIFE INSURANCE** §<br>**COMPANY** an Oklahoma Corporation §<br>§<br>**Defendant.** §<br>§ | **EP-24-CV-00201-KC** |

## COMPLAINT

Pro Se Plaintiff Yazmin Gonzalez files this Complaint against Liberty Bankers Life Insurance Company for violations of the federal Telephone Consumer Protection Act ("TCPA") and its regulations alleging as follows:

### INTRODUCTION

1. In December 2023, Plaintiff began to receive a barrage of illegal telemarketing calls made on behalf of Liberty Bankers Life Insurance Company by an unknown anonymous telemarketer soliciting life insurance.

2. Plaintiff seeks redress under the TCPA, demanding that the calls stop.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Counts I under 28 U.S.C § 1331, because the claims arise under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (holding that federal courts have federal question jurisdiction over private actions brought under the TCPA).

4.  This Court has general personal jurisdiction over Defendant because Defendant's principal office is located in Farmers Branch, Texas.

5.  Venue is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES AND OTHER ENTITIES

6.  Plaintiff YAZMIN GONZALEZ ("Plaintiff" or "Gonzalez") is a natural person domiciled in Texas who received incessant and intrusive calls made on behalf of Liberty Bankers Life Insurance Company to market life insurance.

7.  Defendant LIBERTY BANKERS LIFE INSURANCE ("Defendant" or "Liberty") is an Insurance Company organized and existing under the laws of Oklahoma and can be registered via register agent Northwest Registered Agent Inc. at 1999 Bryan St, suite 900, Dallas, TX 75201.

8.  Unnamed Party Muhammad Baloch ("Baloch") is an insurance agent appointed and authorized by Defendant Liberty to market and sell insurance on behalf of Liberty.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

9.  In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10.  The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11.    The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13.    Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15.    According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

16.    The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17.    The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

3

requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18.    *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19.    The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.    Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

21.    A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose

4

much of its force.")

## FACTUAL ALLEGATIONS

22.   Plaintiff successfully registered her phone number ending in -1859 on the National Do-Not-Call Registry ("DNC") in March 2022.

23.   The TCPA was enacted to protect consumers' privacy interests by prohibiting unwanted, repetitive, and invasive telephone solicitations.

24.   Baloch is a licensed insurance agent that was appointed by Liberty to market, solicit, and sell insurance on behalf of Liberty on August 11, 2023.

25.   Liberty appointed Baloch with the knowledge and expectation that Baloch would make phone calls to solicit Liberty's products and services.

26.   Liberty had the responsibility to ensure the agents Liberty appointed and authorized to solicit their products obeyed federal and state consumer protection laws.

27.   On or about December 8, 2023, Plaintiff began receiving such calls from Defendant to her El Paso-area cellular telephone number ending in -1859.

28.   Plaintiff received at least twelve (12) calls from a variety of spoofed phone numbers from telemarketers and direct Liberty employees soliciting life insurance on behalf of Liberty.

29.   Plaintiff answered call numbers #1 and #2. Plaintiff was then connected to a telemarketer who was soliciting for life insurance and did not properly identify himself or whom he was calling on behalf of. Each of the telemarketers identified themselves as calling on behalf of "Senior Benefits."

30.   On December 28, 2023, Plaintiff received call #3 from phone number 915-691-9079. Plaintiff was then connected to the same telemarketer who was soliciting for life insurance.

31.   Plaintiff was annoyed by the calls and pretended to be her mother "Norma" to ascertain who was behind the solicitation calls.

32.   The telemarketer asked qualifying questions and attempted to transfer the call but the call disconnected.

33.   The telemarketer called back from phone number 323-455-6636 (call #4). Plaintiff then was transferred to an agent who identified himself as "Muhammad Baloch" who did not identify the company he worked for.

34.   Agent Muhammad verified and asked qualifying questions to Plaintiff. Muhammad then informed Plaintiff he was going to transfer her to an agent from Liberty Bankers. The insurance agent completed the application.

35.   On or about January 5, 2024, Plaintiff received the life insurance policy in the mail and confirmed the solicitation calls were on behalf of Defendant Liberty Bankers.

36.   Liberty issued policy number 322911L and page 3 of the application included the signature of Muhammad Baloch. This is the same Baloch that Plaintiff spoke to on December 28, 2023.

37.   Plaintiff cancelled her insurance on January 23, 2024, and ended the established business relationship created when Plaintiff purchased the insurance policy as part of her investigation.

38.   On February 6, 2024, Plaintiff received a call from phone number 810-666-1315 (call #5). The telemarketer identified himself as "James from Liberty Bankers." Plaintiff informed the telemarketer she had already canceled the policy and to remove her from the call list.  This was a DNC request.

39.   On February 14, 2024, Plaintiff received a phone call from phone number 810-666-1367 inquiring about why Plaintiff had canceled her insurance policy with Liberty.  Plaintiff gave another DNC request.

40.   On February 14, 2024, Plaintiff received a phone call from phone number 224-223-8354.  This phone call also inquired about why Plaintiff canceled her insurance policy with Liberty.  Plaintiff gave another DNC request.

41.   Surprisingly the calls did not stop, from March 28, 2024, to May 6, 2024, Plaintiff received a total of 5 additional calls.

42.   Plaintiff received calls from various spoofed caller IDs from March 28, 2024, to May 6, 2024. The agents on these calls identified themselves as: "Clara from Liberty Bankers," "Adam from Liberty Bankers," and "Michael from Liberty Bankers." Plaintiff made DNC requests on each of these phone calls. The totality of the phone calls is listed in Table A below.

43.   Through information and belief, Clara, Adam, and Michael are employees of Liberty Bankers, as they expressly identified themselves as being "from Liberty Bankers."

44.   Liberty Bankers is directly responsible for the phone calls made by Liberty Bankers employees.

45.   Plaintiff did not have an established business relationship with Defendant, nor did Plaintiff consent to any of these calls.

46.   Plaintiff answered each call described in Table A. Every call Plaintiff answered was connected to a telemarketer who falsely identified the company they were calling on behalf of, as "Senior Benefits."

47.   TABLE A below displays calls to phone number ending in -1859 made to Plaintiff.

TABLE A:

| Number: | Date: | Caller ID: | Notes: |
|---------|-------|-----------|--------|
| 1. | 12/08/23 | 860-544-6636 | Telemarketer soliciting for life insurance. |
| 2. | 12/27/23 | 915-799-4004 | Telemarketer soliciting for life insurance. |
| 3. | 12/28/23 | 915-691-9079 | Telemarketer soliciting for life insurance. |
| 4. | 12/28/23 | 323-455-6636 | Telemarketer transfer Plaintiff to Muhammad |
| 5. | 02/06/24 | 810-666-1315 | Do Not Call request |

| 6. | 02/14/24 | 810-666-1367 | Do Not Call request |
| 7. | 02/14/24 | 224-223-8354 | Do Not Call request |
| 8. | 03/28/24 | 512-649-3478 | Do Not Call request |
| 9. | 04/23/24 | 000-000-0000 | Clara from Liberty Bankers. Informed her I already canceled the policy. |
| 10. | 04/23/24 | 810-666-1315 | Adam from Liberty Bankers. Made another DNC request. |
| 11. | 04/23/24 | 512-649-0378 | Michael from Liberty Bankers.  Made DNC request. |
| 12. | 05/06/24 | 512-649-0378 | Michael from Liberty Bankers.  Made DNC request. |

48.   Defendants' placement of multiple calls within a twelve-month period to Plaintiff's residential phone line, listed on the National DNC Registry since March 2022, violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c).

49.   Defendants' violations described in paragraph 36 were knowing and willful because Liberty Bankers had "reason to know, or should have known, that [its] conduct would violate the statute." *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001).  Bad faith is not required.

50.   Liberty Bankers knew or should have known the requirements for making TCPA-compliant telemarketing calls and thus knew or should have known that the calls complained of herein violate the TCPA and its regulations.

51.   Liberty Bankers is well aware of the regulations regarding the TCPA and the ethical prohibition surrounding unsolicited direct advertising to consumers with whom no preexisting relationship exist.

### VICARIOUS LIABILITY OF LIBERTY BANKERS FOR TCPA VIOLATIONS MADE BY THE NON-LIBERTY EMPLOYEES

52.   Liberty Bankers is "vicariously liable" under federal common law principles of agency for TCPA violations committed by third-party telemarketers." *In re Joint Pet. filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6582 (2013).

53.   Liberty Bankers markets Life Insurance through direct telephone solicitation by its hired telemarketers, who act on its behalf.  Telemarketer transfers live, hot leads to Liberty Bankers and Liberty Bankers accepts the leads.  Telemarketers were Liberty Bankers's agent when it made the prohibited calls on behalf of and with the actual authority from, telemarketers pursuant to a contract that governs telemarketing for Liberty Bankers.

54.   Liberty Bankers directs, controls, authorizes, and pays Telemarketers to generate live-transfer leads for Defendant Liberty Bankers's services through telephone solicitation.

55.   Liberty Bankers sets the criteria for qualifying leads, which Telemarketers must follow, and telemarketers live-transfers leads qualified on those criteria exclusively to Liberty Bankers.

56.   On information and belief, Liberty Bankers writes or at least approves the call script telemarketers use when qualifying leads for Liberty Bankers.

57.   The telemarketers are Liberty Bankers's associates and do nothing to disturb the impression telemarketers work for and speak and act on behalf of Liberty Bankers.

58.   The Telemarketers are Liberty Bankers's associates and do nothing to disturb the impression the telemarketers work for, speak, and act on behalf of Liberty Bankers.

59.   From Telemarketers initial call through Defendant Liberty Bankers's acceptance of a completed life insurance application, the telemarketing of Liberty Bankers's services constitutes a singular, coordinated marketing effort devised, authorized, directed, and controlled by Liberty Bankers, the principal, with Telemarketers acting as Liberty Bankers's agent.

60.    Telemarketer, Co acting with actual authority, made the prohibited calls at the direct and control of Liberty Bankers, qualified Plaintiff according to Liberty Bankers's criteria, and then live-transferred Plaintiff to Liberty Bankers's advisor to continue marketing final expense life insurance policy.

## INJURY, HARM, DAMAGES, AND ACTUAL DAMAGES TO PLAINTIFF

61.    Plaintiff has been denied the use of her phone, enjoyment of his phone, and had the functionality of her phone decreased because of unnecessary charging, erosion of phone memory, and her privacy invaded by the harassing telemarketing calls.

62.    Defendants' calls harmed Plaintiff by causing the very harm that Congress sought to prevent a "nuisance and invasion of privacy."

63.    Plaintiff has been annoyed, harassed, and irritated by unauthorized calls placed on behalf of Defendants.

64.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone by placing unwanted telemarketing calls to Plaintiff.

### COUNT I
### Violation of the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)

65.    Plaintiff incorporates by reference each and every paragraph of this complaint as if fully set forth herein.

66.    The TCPA prohibits telephone solicitation of residential telephone subscribers whose numbers are registered on the National Do-Not-Call Registry, 47 U.S.C. § 227(c)(5).

67.    Even though Plaintiff's number has been registered on the National DNC Registry since March 2022, Liberty Bankers made unsolicited telephone solicitations to Plaintiff's residential telephone

line, without Plaintiff's consent, and thereby violated 47 U.S.C § 227(c) and 47 C.F.R. § 64.1200(c) (the "DNC Violations").

68.    Plaintiff suffered the following injuries from each and every TCPA Violation:  invasion of privacy; intrusion on Plaintiff's right of seclusion; occupation of Plaintiff's telephone line by unwelcome calls, rendering the phone unavailable for legitimate calls; inconvenience; loss of usefulness of Plaintiff's phone; unnecessary expenditure of Plaintiff's phone's battery power; degradation of the battery; and trespass to Plaintiff's chattel, namely her cellular telephone.

69.    Under § 227(c)(5), Plaintiff is entitled to receive up to $500 in damages for each violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c).  Because the violations were knowing and willful, *see* Paragraphs 31-33, the Court may award up to $1500 per violation.

70.    Accordingly, Plaintiff seeks and order under Section 227(c)(5) awarding $1500 for each DNC Violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

    A.    Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

    B.    A declaration that actions complained of herein by Defendant violate the TCPA and Texas state law;

    C.    An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

    D.    An award of $1,500 per call in statutory damages arising from the TCPA § 227(c) intentional violations jointly and severally against the corporation for twelve (12) calls;

    E.    An award to Ms. Gonzalez of damages, as allowed by law under the TCPA;

F.    An award to Ms. Gonzalez of interest, costs and attorneys' fees, as allowed by law and equity;

G.    Such further relief as the Court deems necessary, just, and proper.

June 11, 2024,                                                    Respectfully submitted,

                                                                 Yazmin Gonzalez
                                                                 Plaintiff, Pro Se
                                                                 14205 Charles Pollock
                                                                 El Paso, TX 79938
                                                                 915-820-1859

## I.    Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all claims so triable.

June 11, 2024,                                                    Respectfully submitted,

                                                                 Yazmin Gonzalez
                                                                 Plaintiff, Pro Se
                                                                 14205 Charles Pollock
                                                                 El Paso, TX 79938
                                                                 915-820-1859



1605 LBJ Freeway, Suite 700, Dallas, TX 75234

Toll Free 800-731-4300

**Exhibit**

**2**

## <u>PRODUCER AGREEMENT</u>

THIS PRODUCER AGREEMENT, including any Exhibits or Addenda attached hereto, (the "**Agreement**") is made and effective on the date signed below, by and between Liberty Bankers Life Insurance Company and its Subsidiaries ("**LBIG**," "**Company**," or "**Us**") and the Producer that has signed this Agreement below ("**Producer**" or "**You**"). The Company and Producer are each a "Party" to this Agreement and are sometimes collectively referred to as the "Parties."

**WHEREAS**, Producer desires to market and sell insurance products for the Company; and

**WHEREAS**, the Company desires to retain Producer to market and sell insurance products on and subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the covenants, promises, representations, and warranties set forth herein, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by the Parties), intending to be legally bound hereby, the Parties agree as follows.

1.    <u>**AUTHORITY TO SOLICIT.**</u> The Company appoints the Producer as one of its producers authorized to solicit applications for insurance contracts for the Company (the "**Services**"). Producer represents and warrants that he/she/it possesses legal authority and necessary licenses to solicit, negotiate, and sell insurance products of the Company.

2.    <u>**INDEPENDENT CONTRACTOR.**</u> Producer is an independent contractor and nothing contained in this Agreement shall be construed to create the relationship of employer and employee between the Producer, or any other producer, and the Company.  Producer shall exercise discretion and independent judgment as to the persons from whom applications for insurance contracts will be solicited, the time and place of such solicitations, and the general nature of the Services Producer provides for the Company. As an independent contractor and not an employee of the Company, Producer shall be solely responsible for paying any and all of Producer's expenses relating to the Services provided hereunder (the "**Expenses**"), including, without limitation, rentals, transportation, salaries, attorney or legal fees which pertain to the administration of Producer's business, the marketing or sale of insurance products, postage, advertising, producer licensing fees and/or producer occupational taxes.  Company shall have no liability for or responsibility to reimburse Producer for any Expenses.

3.    <u>**DUTIES.**</u> In preforming the Services, Producer shall have the duties set forth in this Section and shall perform such services strictly in accordance with such duties and obligations.  In performing the Services, Producer shall promote and safeguard the best interests of the Company; and, in doing so: (i) shall fairly, truthfully, and properly represent the Company and its products and services; and (ii) shall faithfully perform, in an ethical and professional manner, all duties within the scope of the appointment under this Agreement.

In particular, but without limitation, the Producer represents, warrants, and covenants that:

a.    Producer is aware of, and shall stay current with all applicable laws, rules, and regulations which apply to the Services, including, without limitation, state and federal insurance laws, and agrees to comply with such laws, rules, and regulations, at all times.

b.    Prior to soliciting business from customers, Producer agrees that he, she, or it shall be familiar with the provisions of all the Company's insurance contracts for the products that Producer is authorized to sell.

c.    Producer shall attend any seminars or training sessions as deemed to be necessary by the Company, in its sole discretion.

d.    Producer shall become familiar with and agrees to strictly observe and comply with any rules, regulations, policies, procedures, best practices, and requirements set forth from time to time by the Company.

e.    Producer agrees to promptly make known and available to the Company all information which comes into

Producer's possession, custody, control, or knowledge at any time concerning the underwriting of any risk relative to any potential insured.

f.      Producer agrees to promptly make known and available to the Company all information which comes into Producer's possession, custody, control, or knowledge at any time concerning Producer's suitability to perform or failure to perform any provision of this Agreement.

g.      Producer, at Producer's cost and expense, agrees to keep in good standing all licenses, permits, registrations, and continuing education requirements that are required to solicit applications for insurance contracts to be issued by the Company.

h.      Producer shall ensure that any of Producer's employees that provide some or all of the Services are properly licensed to provide such Service.

i.      For each application of insurance, the Producer shall collect a signed bank draft authorization (to the extent permitted by Company) and shall promptly deliver all applications and documents to the Company in whatsoever manner the Company shall direct. Producer agrees that he/she is not authorized to collect or hold any funds for the Company and Producer shall not hold any funds of the Company.

j.      Producer agrees to keep complete and accurate records of all transactions related to this Agreement or the Services provided hereunder for a period of at least seven (7) years from the date of such transactions or longer if required by federal or state law or regulation.  Producer shall provide copies of such records to Company upon demand.  Company shall have the right, during normal business hours and with reasonable notice, to inspect, audit, and make copies from the books and records of Producer relating to the Services.

k.      The Producer shall not make recommendations to applicants to purchase insurance contracts in the absence of reasonable grounds to believe the purchase of such insurance contracts is suitable for the applicant. The procedure of determining whether the purchase is suitable shall include, but is not limited to, a thorough review and understanding of each applicant's financial situation and insurance needs, and a review of all proposals and applications for insurance contracts to the Company for completeness and correctness as to form and as to representations made by the applicant to the Producer in connection with same.

4.      **TERRITORY.** The Producer agrees to solicit applications for insurance only in territories approved by the Company in which the Producer and the Company are duly licensed, appointed, and authorized to conduct business. No territory is exclusively assigned by the Company to the Producer.

5.      **LIMITATION OF AUTHORITY.** All powers and authority granted to Producer by the Company are limited to those expressly provided under this Agreement, shall continue only during the duration of this Agreement, and shall terminate on the date that this Agreement terminates or is terminated.  Producer's authority to act on the Company's behalf shall exist only as expressly stated in this Agreement and not otherwise. No right, power, or authority for the Producer to act on the Company's behalf shall be implied. Specifically, but not in limitation of the foregoing, Producer agrees that Producer is without authority to do or perform - and expressly agrees not to do or perform - the following acts on Company's behalf: (a) incur any indebtedness or liability; (b) make, alter, or discharge any insurance contract or other contracts; (c) waive forfeitures; (d) quote rates other than as quoted by the Company; (e) extend the time for payment of any premium; (f) accept payment in cash or in a money order without holding said funds in trust for the Company and promptly remitting them to the Company; (g) guarantee dividends; or (h) deliver any insurance contract more than ten (10) days after issuance by the Company  or fail to promptly return the delivery receipt to the Company; (i) violate the insurance laws of any state in which Producer or his, her, or its employees, contractors, agents, or those acting on Producer's behalf  may be soliciting applications for insurance contracts; j) withhold any of the Company's, the insurance contract owner's, prospective insurance contract owner's, or applicant's monies or property; (k) rebate or offer to rebate all or any part of a premium on the Company's  insurance contracts; (l) induce or attempt to induce any of the Company's insurance contract owners to discontinue payment of premiums or to relinquish any insurance contract; (m) induce or attempt to induce or solicit any of other insurance producer to terminate their agreements with the Company; (n) perpetrate any fraud against the Company  or its  insurance contract owners, prospective insurance contract owners, or applicants; (o) fail to provide contract disclosure documents to insurance contract applicants as required by the Company or applicable law; (p) fail to provide compensation disclosures to insurance contract applicants as required by law; (q) violate any policies and procedures of the Company; (r) solicit the employment of or induce the termination of employment of any Employee of Company; or (s) any engage in any act with respect to or on behalf of the Company other than as expressly authorized herein.

6.      **COMMISSIONS.** During the term of, and subject to the provisions of this Agreement, and subject to the rules and regulations of the Company, the Producer shall be entitled, as full compensation for all of Producer's services and

expenses hereunder, those commissions as set forth in the applicable Producer Commission Schedule attached hereto and incorporated herein by reference, or as subsequently provided to Producer, as amended from time to time by Company in its sole and absolute discretion, on all business produced by Producer personally, less amounts due to the Company. Commissions shall be paid hereunder only for so long as the Producer is the insurance producer of record.  Commissions are subject to chargeback by the Company. The Company, in its sole and absolute discretion, may advance certain commissions to Producer, but shall be under no obligation to make such advances. The Producer specifically recognizes, accepts and agrees the Producer has responsibility for payment of any taxes levied by federal, state or local authorities as a result of compensation arising under this Agreement.   Upon the Producer's death, all vested commissions not otherwise held by the Company for the Producer's obligations (e.g., chargebacks, repayment of advances, etc.) will be paid to the Producer's estate, if Producer is a natural person.

7. <u>**COMMISSION CHARGEBACKS AND REFUNDS.**</u> The Company, in its sole discretion, has the right to determine: (a) the status of each insurance contract, including but not limited to whether the insurance contract is or is not issued, withdrawn, cancelled, rescinded, returned during the free-look provision, lapsed for reasons other than death of the insured, void, and/or voidable, and; (b) whether to charge back any and all commissions paid to the Producer regarding the same. Any and call chargebacks are immediately due and payable by the Producer to the Company.

8. <u>**COMMISSION ADVANCES.**</u> Producer agrees to immediately and upon demand, pay back to the Company any and all commission advances paid by the Company, and authorizes the Company to offset future commissions earned by the Producer. While any balance is outstanding for advances made by the Company, or for interest on such advances, all commissions earned on any insurance contract may be applied by the Company, in its sole and absolute discretion, to the repayment of such advances. All such advances made under this Agreement shall be secured by a lien in favor of the Company with respect the Producer's commissions from the submission of any and all insurance contracts by said Producer, and shall be individually guaranteed by the Producer and any owners of the Producer, if the Producer is an entity. The Company may, in its sole and absolute discretion, pay a net advance after reducing the gross advance for any chargeback or other Producer indebtedness.

9. <u>**PRODUCER INDEBTEDNESS TO COMPANY.**</u> The Producer agrees that the Company may, at any time and in its sole and absolute discretion, offset against any advance, commissions due, or commissions to become due to Producer for any amount the Producer owes to the Company. The Company reserves the right to demand repayment of the Producer's balance owed to the Company at any time, upon which demand, the Producer agrees to promptly tender such balance to the Company.  Producer agrees that the Company may pursue collection of any said indebtedness. The Company reserves the right to delay collection of any balance owed to the Company and any delay of collection is not and shall not be construed as a waiver nor any other form of forgiveness of any balance owed by the Producer to the Company. Should Company terminate this Producer Agreement as a result of a debit balance which remains unpaid for more than 30 days, Producer agrees to forfeit all commissions due them under this Agreement.

10. <u>**TRANSFER OF COMMISSIONS.**</u>  Producer shall not assign or transfer any commissions or other amounts due to Producer under this Agreement, unless approved in writing by the Company.  Such approval shall be at the sole and absolute discretion of Company.

11. <u>**EXPENSES.**</u> The Producer shall pay all expenses incurred by Producer in the performance of this Agreement. Any such expenses not paid by the Producer may be offset by the Company, in its sole discretion, against any commissions payable to the Producer.

12. <u>**ADVERTISING & TRADEMARK.**</u> The Producer may prepare and distribute advertising materials pertaining to the Company's insurance products, at the Producer's sole cost and expense; provided, however Producer agrees that he, she, or it will not and shall not distribute any such materials by any method whatsoever without first having filed identical copies of those materials with the Company and obtaining advance approval of those materials, in writing, by an officer of the Company.  The Producer recognizes that the Company retains a proprietary interest in any and all advertising material that uses the name of the Company, any trademark of the Company, or any of the Company's products, and agrees that any leads resulting therefrom shall be private and confidential and shall be subject to the Privacy provisions of this Agreement. Further, the Producer is prohibited from using Company trademarks and other intellectual property without first receiving written permission from the Company. The Producer further agrees to immediately surrender all materials referencing the Company or its products upon request or termination of this Agreement.

13. <u>**REPRESENTATIONS.**</u> The Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf  agree that they will not represent the Producer as holding any professional or trade certification that implies expertise in financial matters relating specifically to persons age 65 or older, including but not limited to "certified senior advisor," until and unless the Producer provides the Company  with accurate information verifying  the nature of such certification and the Company approves, in writing,  the use of such certification in connection with the sale of the Company's products.

14.      **RESERVATIONS.** In addition to the other reservations by the Company in this Agreement, the Company also reserves the following rights, in its sole and absolute discretion, without liability to the Producer to: (a) change commissions on any insurance contract form or rider upon furnishing notice to you, (b) withdraw any insurance contract forms; (c) change its premium rates; (d) reject insurance contract applications or premiums, to the extent authorized by applicable law, without specifying cause; and (e) unilaterally adopt policies and procedures from time to time relating to any matter not otherwise covered in this Agreement and to require Producer's compliance with those policies and procedures.

15.      **LIABILITY.** The Producer shall be jointly and severally liable, with each of Producer's owners, if Producer is not a natural person, to the Company for the payment of all monies, including, but not limited to, commission advances, due from the Producer, or debit balances on the account of the Producer, or debit balances resulting from advances to the Producer from the Company. The Company's books and records shall be prima facie evidence of such debit balances or advances due. The Producer hereby assigns to the Company, with recourse, all monies, including, but not limited to, commission advances, due from the Producer, or debit balances on the account of the Producer, or debit balances resulting from advances to the Producer from the Company as collateral for all such monies due or debit balance or advances. The Company may, in its sole discretion, at any time offset any debt or debts due from the Producer to the Company arising from Producer's transactions under this or any previous or subsequent Agreement against any commission or other compensation due or to become due Producer from the Company and any and all affiliates of the Company. The Producer agrees to promptly execute and return, upon request by the Company, all other documents required of Producer by the Company in order to properly evidence and effectuate such assignments, and to guarantee the legal enforceability thereof.

16.      **ASSIGNMENTS.** No assignment of any commission or any other monies, or any portion thereof due to or to become due the Producer hereunder shall be valid unless authorized in advance and in writing by an Officer of the Company. Any assignment of commissions so authorized shall be subject to any and all indebtedness of the Producer to the Company then existing or thereafter accruing. Producer shall not assign any of its rights or duties under this Agreement without the prior written consent of the Company, consent shall be withheld or granted in the Company's sole and absolute discretion. The Company may assign or otherwise transfer this Agreement or any of Company's rights, duties, or interests arising under this Agreement in its sole and absolute discretion.

17.      **TERMINATION.** This Agreement shall terminate on the earliest of the following dates:

a.      The date of death, permanent disability, or incapacity of Producer, or the filing for dissolution, liquidation, bankruptcy, or insolvency of Producer;

b.      This Agreement may be terminated without cause by either party upon at least 10 days prior written notice, or immediately, upon written notice, for cause. "For cause" in this regard means: a) the Producer's breach of any provision of this Agreement; or b) that the Company has reason to believe that the Producer has engaged in wrongdoing including but not limited to the following: for: (1) withholding or embezzling Company funds, (2) fraud, misrepresentation, dishonesty or breach of fiduciary duty against or related to the Services, the Company or its contract holders, or misrepresentation or omission of information regarding the Company's products. Upon termination for cause, Producer's right to all commissions or other compensation thereafter payable under this Agreement, under any prior agreement, and under any other agreements then in force with the Company may, in the Company's sole discretion, be terminated by the Company.

18.      **EFFECT OF TERMINATION.** Upon any termination of this Agreement, any and all of Producer's obligations to the Company shall mature, accelerate and become immediately due and payable in full, and Producer shall immediately, and without further notice, return to the Company any insurance contracts in Producer's possession and all other Company materials and Company property in the possession or under the control of Producer. Upon termination, Producer shall have no further authority to solicit business for the Company, or to represent the Company in any manner; but all other provisions of this agreement shall survive its termination.

19.      **LEGAL ACTION.** Producer has no authority to, and shall not, institute any administrative or legal proceedings on the Company's behalf. If the Company is a party to any administrative or legal action, or both, by reason of an alleged act, fault, or failure by Producer in connection with Producer's acts or omissions, the Company may, in its sole discretion, require the Producer to hire and pay an attorney designated by the Company, in its sole and absolute discretion, to represent the Company. However, at the Company's option, and in its sole discretion, the Company may defend or institute any such action and expend such sums, including attorney fees, expenses and costs as may in the Company's judgment be necessary and the Producer agrees that it shall be liable for and shall reimburse the Company, immediately upon demand, for all such amounts.

20.      **INDEMNIFICATION.** Producer agrees to defend (with counsel selected by the Company in its sole and absolute discretion), indemnify and hold harmless the Company, its affiliates and their respective employees, officers, directors and shareholders from any and all claims, actions, liability, damages, expenses, and loss which arise from, result from, or relate to Producer's' real or alleged negligent, willful, or criminal acts, or the Producer's errors, omissions or breach

of any provision of this Agreement and such acts, errors, omissions or breaches of Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf, in the performance of Producer's duties under this Agreement. Claims, liability, or loss includes, but is not limited to, all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense or expenditure incurred by the Company. This indemnification will be in addition to any liability Producer may otherwise have.

21.   **COMPLAINTS AND INVESTIGATIONS.**

a.    Producer agrees to cooperate fully in any insurance regulatory investigation, inquiry, complaint, proceeding or assessment of regulatory discipline by or against the Company, and in any investigation with respect to any potential, threatened, or actual litigation or proceeding by or against the Company, including without limitation, that Producer agrees to promptly notify the Company in writing upon receiving notice of:

   (1)   any customer complaint pertaining to Producer or his, her, or its employees, contractors, agents, and those acting on Producer's behalf; the Company; or any insurance product marketed under this Agreement

   (2)   any potential, threatened, or actual litigation or proceeding related to Producer or the Company; and

   (3)   any regulatory inquiry, complaint or investigation, or assessment of any regulatory discipline with respect to this Agreement or any insurance product or other insurance-related activity pertaining to either the Company or any insurance product marketed under this Agreement.

b.    Producer agrees to promptly provide the Company with a copy of all correspondence and documents in its possession regarding the matters set forth in this Section.

c.    Producer agrees to promptly and fully respond to all inquiries from the Company regarding each of the matters set forth in this Section.

d.    Upon request by the Company, the Producer shall provide a written response to the matters set forth in this Section, to the customer or regulatory authority involved but in no event may the Producer do so unless it first has provided that written response to the Company and has obtained prior written approval by the Company for transmission of the response to the customer or regulatory authority.

e.    Upon request by the Company, the Producer shall promptly provide true and correct witness statements, affidavits, declarations or testimony related to each of the matters set forth in in this Section.

f.    The provisions of this section shall remain in full force and effect regardless of any termination of this Agreement.

22.   **CONFIDENTIALITY AND PRIVACY**. Producer shall treat as confidential all confidential information of the Company, including, but not limited to, all non-public information including proprietary information of the Company. Producer shall treat customer information as confidential as required by applicable law and by the Company, as described in the Company's privacy notices and in accordance with the Company policies and procedures. Producer shall also take reasonable steps to establish and implement administrative, physical and technical procedures and safeguards to ensure the confidentiality, security and integrity of customer information. Producer agrees to comply with the Company's terms of use, policies and procedures with respect to use of Company electronic systems providing access to customer information by Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf, and Producer shall promptly report to the Company any breach of security related to such systems of which it becomes aware. Producer may use customer information only for the purpose of fulfilling Producer's obligations under this Agreement. Producer agrees to limit access to customer information to his, her, or its employees, contractors, agents, and those acting on Producer's behalf and other parties who need to know such customer information to permit Producer to fulfill its obligations under this Agreement and who have agreed to treat such customer information in accordance with the terms of this Agreement. Producer agrees not to disclose or otherwise make accessible customer information to anyone other than to the individual to whom the information relates (or to his or her legally authorized representative) or to other persons pursuant to a valid authorization signed by the individual to whom the information relates (or by his or her legally authorized representative), except as required for Producer to fulfill Producer's obligations under this Agreement, as otherwise directed by the Company, or as expressly required by applicable law. For purposes of this Agreement, "customer information" means information in any form that Producer obtained, had access to or created in connection with Producer's obligations under this Agreement regarding individuals who applied for or purchased insurance contracts, as well as client lists and information, contacts, leads, Company materials, insurance producer manuals, and records. Customer information includes nonpublic personal information, financial

information, and protected health information, as defined in applicable law. Customer information also includes, but is not limited to, information such as the individual's name, address, telephone number, social security number, as well as the fact that the individual has applied for, is insured under, or has purchased an insurance contract issued by the Company.

23. **NOTICE.** Any notices required under the terms of this Agreement shall be sent, if to the Producer at the address set forth in the Producer's application for appointment (or as changed by Producer by giving notice in the manner set forth herein) or may be electronically delivered to Producer or made available to Producer.  Any notices to the Company required under the terms of this Agreement shall be sent via certified mail, return receipt requested, to the Company, at the address or at such other addresses as Company may from time to time designate to Producer. Any written notice to Producer required under this Agreement shall be deemed received one day following the date of mailing or delivery to Producer. Any written notice required under this Agreement to Company shall be deemed received, if sent properly addressed to Company by prepaid certified mail, return receipt requested, on the date actually received.

24. **SEVERABILITY.** Any provision of this Agreement which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision contained herein, and such other provisions shall remain in full force and effect.

25. **WAIVER.** The failure or forbearance or neglect of the Company to insist upon the strict performance of any provision of this Agreement or of any rule or regulation of the Company shall not be construed as a waiver thereof, but such provisions, rules and regulations shall continue to be in full force and effect.

26. **ENTIRE AGREEMENT.** This Agreement and other written documents executed by the parties hereto, including the Producer/Agency Application for Appointment, Annualization Agreement, and Business Associate Addendum attached hereto, contain the entire agreement between the parties and there are no verbal representations, warranties, or agreements between the Parties of any kind whatsoever. This Agreement supersedes and replaces any and all other agreements between the Producer and the Company relating to the same matters. However, all financial obligations of the Parties to each other under any such prior Agreement(s), including debit balances, other debts, liens, rights to offset, and the obligation to pay commissions, still exist and will be combined and merged with similar obligations under this Agreement.

27. **AMENDMENT.** No term or provision of this Agreement may be changed, waived, discharged or terminated orally.  Any change, waiver, discharge or termination of this agreement must be in writing, signed by the party against which enforcement of the change, waiver, discharge or termination is sought. No such modification, change or waiver of terms of this Agreement will bind the Company, unless it is in writing signed by an officer of the Company, and specifically expresses an intention to modify, change or waive terms of this  Agreement.  For the purposes of this Section, electronic mail messages shall not be deemed to be writings signed by the Parties.  Notwithstanding the foregoing, the Company may amend this Agreement by providing written or electronic notice of the amendment to the Producer ten (10) days or more before the amendment's effective date, and the amendment will automatically become effective without Producer's written agreement. Further, and notwithstanding the foregoing, the Company may also amend this Agreement immediately and without notice or Producer's agreement in order to comply with any applicable law effective as of the date specified in the amendment.

28. **GOVERNING LAW AND FORUM.** This Agreement is made according to the laws of the State of Texas. The Parties expressly agree that this Agreement is governed by, and will be construed and enforced in accordance with, the laws of the State of Texas, without regard to its rules with respect to conflicts of laws. The forum for any dispute arising out of or related to this Agreement shall be the State of Texas. **VENUE FOR ANY DISPUTE ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL LIE SOLELY IN THE STATE AND FEDERAL COURTS LOCATED IN DALLAS COUNTY, TEXAS.  EACH PARTY AGREES TO SUBJECT ITSELF TO THE PERSONAL JURISDICTION OF THE FORUM AND SHALL NOT CONTEST SUCH JURISDICTION, THE VENUE OF SUCH COURT, OR THE CONVENIENCE OF THE FORUM.**

29. **ATTORNEY'S FEES AND COSTS.**  In the event that the Company refers any indebtedness of the Producer for collection, or in the event of litigation between the Parties arising out of or related to the performance or nonperformance of any obligation by the Producer to the Company, the Producer herein agrees that it is liable for and shall reimburse the Company for its costs, reasonable attorneys' fees, and expenses in connection therewith. This provision shall remain in full force and effect regardless of any termination of this Agreement.

30. **JURY WAIVER. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY, IRREVOCABLY, AND INTENTIONALLY WAIVE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE PARTIES ENTERING INTO THIS AGREEMENT. THIS PROVISION SHALL REMAIN IN FULL FORCE AND EFFECT REGARDLESS OF ANY TERMINATION OF THIS AGREEMENT.**

31.   **AUTHORIZATION.** Each individual signing this Agreement warrants and represents that he or she has the full authority and is duly authorized and empowered to execute this Agreement on behalf of the Party for which he or she signs.

32.   **COUNTERPARTS/COPIES.** This Agreement may be executed in one (1) or more counterparts each of which shall be deemed to be an original, and all of which when taken together shall constitute one and the same instrument. This Agreement may also be executed electronically or via facsimile or e-mail, and electronic, facsimile and e-mail signatures shall be treated as originals for all purposes.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement effective _____06/12/2023_____.

**PRODUCER:**

☒ an individual, ☐ a partnership,
☐ a limited liability company,  ☐ a corporation

Muhammad Salman Ali Baloch
_____
*Printed Name*

_____
*Signature*

_____
*If a Corporation, State of Organization*

**LIBERTY BANKERS LIFE INSURANCE COMPANY and its SUBSIDIARIES:**

Eric Johansson
_____
*Printed Name*

_____
*Signature of Officer*

COO
_____
*Title*

## GUARANTEE BY OFFICERS, MEMBERS, OR PARTNERS

**If the Producer is a business entity**, each of the undersigned, in consideration of the Company executing this Agreement, represents to the Company that the principal stockholders, members, or partners of the Agency, with their percentage of interest in the total ownership of the Agency, are as follows, and does hereby personally jointly and severally guarantee the performance of all terms, liability and responsibility for any default by Producer of an provisions, terms, conditions, and/or covenants of this Agreement and/or any amendments thereto.

| Signature | X | Title | | % Interest | |
|---|---|---|---|---|---|
| Signature | X | Title | | % Interest | |
| Signature | X | Title | | % Interest | |
| Signature | X | Title | | % Interest | |



**Exhibit**

**3**

exhibitsticker.com

1605 LBJ Freeway, Suite 700, Dallas, TX  75234  ●  Toll Free 800-731-4300

## PRODUCER TELEMARKETING ACKNOWLEDGEMENT

As part of Your contracting with Liberty Bankers Life Insurance Company and its Subsidiaries ("Company"), You are required to review and sign this Acknowledgement regarding telemarketing practices where a Company, Company service, or Company product might be mentioned or offered (including inbound calls from a lead vendor, texts, emails, faxes). All reference to "Seller" in this document means You, Your sub-producers, and Your lead vendor. "Call" means all attempted outbound telephone calls or texts, attempted telephone call transfers, and acceptance of telephone call transfers that involve or encourage the potential purchase of, or investment in, property, goods, or services.

Calls are subject to specific state and federal laws. Federal laws impose disclosure requirements, set permitted hours, and impose other conditions and restrictions. To the extent Seller engages in telemarketing Calls, or hires or permits others to do so on Seller's behalf, Seller must be aware of, and strictly comply with, all federal telemarketing laws and states telemarketing laws related to the Call. For example, the Telephone Consumer Protection Act ("TCPA") is the primary federal law that applies to Calls. The TCPA contains numerous restrictions on when, where, how, and to whom telemarketing Calls may be placed. The TCPA law and related regulations are complex. If Seller is unfamiliar with the TCPA, a good starting place is the Federal Communications Commission consumer website that can be found here: https://www.fcc.gov/tags/telephone-consumer-protection-act-tcpa. Please note that some states have additional consumer protections, if Seller is unfamiliar with state law, a good starting place is this compilation: https://tcpa.mobi/state-do-not-call-list/ and this resource: https://www.dnc.com/news/tags/state-laws. However, Seller should also check the state Attorney General's website for the telephone area code for the consumers who Seller attempts to contact (a good lead vendor will provide the consumer's area code before transferring a Call).

Seller should **never**: (1) use an automatic telephone dialing system; (2) use a pre-recorded message; or (3) Call numbers on a Do-Not-Call ("DNC") registry – there is a federal DNC registry, some states also have a DNC registry, and the Company has an internal DNC registry available to You on the Company producer portal (or you can request a copy from Compliance@LBIG.com). In some instances, Calls may be permissible if the person receiving the Call has given **prior express written consent**. However, it is Seller's responsibility to verify the prior written consent before placing a Call, transferring a Call, or accepting a Call transfer.

The TCPA also contains rules regarding the time of day Calls may be made and number of rings allowed or required on a Call. For example, companies must let Calls ring for at least 15 seconds or 4 rings, and must prohibit Calls before 9:00 am or after 8:00 pm local time in the consumer's location.

Seller must take complaints regarding marketing or unethical sales behavior seriously. You must investigate any complaints thoroughly, and, if a violation is discovered, terminate and, if necessary, take legal action against who is responsible for such violations.

By signing below, You hereby acknowledge, understand, and agree:
- As an independent contractor, it is Your sole and exclusive responsibility to ensure that Seller abides by all federal, state, and local laws, including telemarketing laws.
- Seller will ensure anyone who works for Seller understands and abides by these same rules.
- You and Your upline will indemnify and hold harmless the Liberty Bankers' company that Seller is acting on behalf of for any and all legal claims related to Seller's violation of consumer protection laws.
- Your contract may be terminated if Liberty Bankers becomes aware of Seller's failure to comply.

---
Muhammad Salman Ali Baloch

*Insurance Producer or Entity Printed Name*

---
*Insurance Producer Signature*

---
06/12/2023

*Date*



**Exhibit**

**4**

# H|J|M|M

**Holmgren Johnson: Mitchell Madden, LLP**
12801 North Central Expressway, Suite 140
Dallas, Texas  75243

**MITCHELL MADDEN, J.D., C.P.A.**
MEMBER TEXAS AND IDAHO BARS
BOARD CERTIFIED, ADMINISTRATIVE LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

**Telephone: (972) 484-7780**
**Facsimile:  (972) 484-7743**
mmadden@hjmmlegal.com

July 24, 2024

***Via E-mail: Salmanbaloch@w4work.net***
Mr. Muhammad Salman Ali Baloch
5614 Lauretta St., Apt. 6
San Diego, CA 92110

***Via Certified Mail, Return Receipt Requested***
Mr. Muhammad Salman Ali Baloch
5614 Lauretta St., Apt. 6
San Diego, CA 92110

Re:  **DEMAND for current fees, expenses and costs, and indemnification**

Dear Mr. Baloch:

Holmgren Johnson: Mitchell Madden, PLLC and its attorneys (the "Firm") have been retained to represent Liberty Bankers Life Insurance Company ("Liberty") in connection with the matters discussed in this letter, including defense of the TCPA Lawsuit discussed above, and any claims it has against Muhammad Salman Ali Baloch ("You" or "Producer") for indemnification or otherwise in connection with same.

More particularly, and without limitation, as you are aware, on June 12, 2023, you signed a Producer's Agreement with Liberty, a true and correct copy of which is attached as ***Exhibit 1***, in which You as "Producer" agreed, among other things, as follows:

    3. **DUTIES.** In preforming *[sic]* the Services, Producer shall have the duties set forth in this Section and shall perform such services strictly in accordance with such duties and obligations. In performing the Services, Producer shall promote and safeguard the best interests of the Company; and, in doing so: (i) shall fairly, truthfully, and properly represent the Company and its products and services; and (ii) shall faithfully perform, in an ethical and professional manner, all duties within the scope of the appointment under this Agreement.

Mr. Muhammad Salman Ali Baloch
July 24, 2024
Page 2

In particular, but without limitation, the Producer represents, warrants, and covenants that:

a. Producer is aware of, and shall stay current with all applicable laws, rules, and regulations which apply to the Services, including, without limitation, state and federal insurance laws, and agrees to comply with such laws, rules, and regulations, at all times.

. . .

d. Producer shall become familiar with and agrees to strictly observe and comply with any rules, regulations, policies, procedures, best practices, and requirements set forth from time to time by the Company.

As You are also aware, on the same date, You signed a Producer Telemarketing Acknowledgement, a true and correct copy of which is attached as ***Exhibit 2***, as part of your contracting with Liberty.  Among other things, it provides that:

…All reference to "Seller" in this document means You, Your sub-producers, and Your lead vendor. "Call" means all attempted outbound telephone calls or texts, attempted telephone call transfers, and acceptance of telephone call transfers that involve or encourage the potential purchase of, or investment in, property, goods, or services.

Calls are subject to specific state and federal laws. Federal laws impose disclosure requirements, set permitted hours, and impose other conditions and restrictions. To the extent Seller engages in telemarketing Calls, or hires or permits others to do so on Seller's behalf, Seller must be aware of, and strictly comply with, all federal telemarketing laws and states telemarketing laws related to the Call. For example, the Telephone Consumer Protection Act ("TCPA") is the primary federal law that applies to Calls….

Seller should **never**: (1) use an automatic telephone dialing system; (2) use a pre-recorded message; or (3) Call numbers on a Do-Not-Call ("DNC") registry – there is a federal DNC registry, some states also have a DNC registry, and the Company has an internal DNC registry available to You on the Company producer portal (or you can request a copy from Compliance@LBIG.com).

. . .

Mr. Muhammad Salman Ali Baloch
July 24, 2024
Page 3

By signing below, You hereby acknowledge, understand, and agree:

- As an independent contractor, it is Your sole and exclusive responsibility to ensure that Seller abides by all federal, state, and local laws, including telemarketing laws.

- Seller will ensure anyone who works for Seller understands and abides by these same rules.

- **You and Your upline will indemnify and hold harmless the Liberty Bankers' company that Seller is acting on behalf of for any and all legal claims related to Seller's violation of consumer protection laws**.

- Your contract may be terminated if Liberty Bankers becomes aware of Seller's failure to comply.

(Emphasis added).

On or about June 19, 2024, Liberty received a summons and Complaint filed by Yazmin Gonzales ("Plaintiff") in Civil Action No. EP-24-CV-00201-KC; *Yazmin Gonzalez v. Liberty Bankers Life Insurance Company*, filed in the United States District Court for the Western District of Texas alleging violations of the federal Telephone Consumer Protection Act (the "TCPA"), a true and correct copy of which is attached as ***Exhibit 3*** (the "TCPA Lawsuit"). As is reflected therein, Liberty is clearly a party to the TCPA Lawsuit by reason of Your alleged acts, faults or failures in connection with Your acts or omissions.

Section 19 of the Producer's Agreement states:

19. **LEGAL ACTION.** Producer has no authority to, and shall not, institute any administrative or legal proceedings on the Company's behalf. If the Company is a party to any administrative or legal action, or both, by reason of an alleged act, fault, or failure by Producer in connection with Producer's acts or omissions, the Company may, in its sole discretion, require the Producer to hire and pay an attorney designated by the Company, in its sole and absolute discretion, to represent the Company. However, at the Company's option, and in its sole discretion, the Company may defend or institute any such action and expend such sums, including attorney fees, expenses and costs as may in the Company's judgment be necessary and the Producer agrees that it shall be liable for and shall reimburse the Company, immediately upon demand, for all such amounts.

Mr. Muhammad Salman Ali Baloch
July 24, 2024
Page 4

Section 20 of the Producer's Agreement provides:

> 20. **INDEMNIFICATION**. Producer agrees to defend (with counsel selected by the Company in its sole and absolute discretion), indemnify and hold harmless the Company, its affiliates and their respective employees, officers, directors and shareholders from any and all claims, actions, liability, damages, expenses, and loss which arise from, result from, or relate to Producer's' real or alleged negligent, willful, or criminal acts, or the Producer's errors, omissions or breach of any provision of this Agreement and such acts, errors, omissions or breaches of Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf, in the performance of Producer's duties under this Agreement. Claims, liability, or loss includes, but is not limited to, all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense or expenditure incurred by the Company. This indemnification will be in addition to any liability Producer may otherwise have.

Liberty has exercised its option and sole discretion to defend the TCPA Lawsuit by hiring the Firm. Accordingly, pursuant to Section 19 of the Producer's Agreement, You are liable for expenses and costs, including attorneys' fees, as may in Liberty's judgment be necessary for same. **demand is hereby made, without waiver of its rights to demand fees, expenses, and costs which have not yet been billed or incurred, that You immediately reimburse Liberty for all such amounts that have been billed through June 30, 2024, which total $3,246.50.** Payment of same should be made in good funds to Liberty Banker's Life Insurance Company, delivered to the undersigned, no later than 5:00 p.m. on July 30, 2024.

Further, Liberty hereby **demands indemnification** from You for all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of Texas) **under Section 20 of the Producer's Agreement** and herein reserves the right to file suit against You for same. **Liberty also demands indemnification** from You for legal claims against it or related to Your violations of the TCPA **under Section 19 of the Producer Telemarketing Acknowledgment,** including for all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of Texas) related to the TCPA Lawsuit or to any suit against You for indemnification and reserves the right to file suit against You for same.

Mr. Muhammad Salman Ali Baloch
July 24, 2024
Page 5


In the meantime, I look forward to receipt of your payment of the current attorneys' fees and expenses in the amount of $3,246.50 by July 30, 2024.

Sincerely,

*/s/ Mitchell Madden*

Mitchell Madden

Attachments



Exhibit
1

1605 LBJ Freeway, Suite 700, Dallas, TX 75234
Toll Free 800-731-4300

## PRODUCER AGREEMENT

THIS PRODUCER AGREEMENT, including any Exhibits or Addenda attached hereto, (the "**Agreement**") is made and effective on the date signed below, by and between Liberty Bankers Life Insurance Company and its Subsidiaries ("**LBIG**," "**Company**," or "**Us**") and the Producer that has signed this Agreement below ("**Producer**" or "**You**"). The Company and Producer are each a "Party" to this Agreement and are sometimes collectively referred to as the "Parties."

**WHEREAS**, Producer desires to market and sell insurance products for the Company; and

**WHEREAS**, the Company desires to retain Producer to market and sell insurance products on and subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the covenants, promises, representations, and warranties set forth herein, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by the Parties), intending to be legally bound hereby, the Parties agree as follows.

1. **AUTHORITY TO SOLICIT.** The Company appoints the Producer as one of its producers authorized to solicit applications for insurance contracts for the Company (the "**Services**"). Producer represents and warrants that he/she/it possesses legal authority and necessary licenses to solicit, negotiate, and sell insurance products of the Company.

2. **INDEPENDENT CONTRACTOR.** Producer is an independent contractor and nothing contained in this Agreement shall be construed to create the relationship of employer and employee between the Producer, or any other producer, and the Company.  Producer shall exercise discretion and independent judgment as to the persons from whom applications for insurance contracts will be solicited, the time and place of such solicitations, and the general nature of the Services Producer provides for the Company. As an independent contractor and not an employee of the Company, Producer shall be solely responsible for paying any and all of Producer's expenses relating to the Services provided hereunder (the "**Expenses**"), including, without limitation, rentals, transportation, salaries, attorney or legal fees which pertain to the administration of Producer's business, the marketing or sale of insurance products, postage, advertising, producer licensing fees and/or producer occupational taxes.  Company shall have no liability for or responsibility to reimburse Producer for any Expenses.

3. **DUTIES.** In preforming the Services, Producer shall have the duties set forth in this Section and shall perform such services strictly in accordance with such duties and obligations.  In performing the Services, Producer shall promote and safeguard the best interests of the Company; and, in doing so: (i) shall fairly, truthfully, and properly represent the Company and its products and services; and (ii) shall faithfully perform, in an ethical and professional manner, all duties within the scope of the appointment under this Agreement.

In particular, but without limitation, the Producer represents, warrants, and covenants that:

a. Producer is aware of, and shall stay current with all applicable laws, rules, and regulations which apply to the Services, including, without limitation, state and federal insurance laws, and agrees to comply with such laws, rules, and regulations, at all times.

b. Prior to soliciting business from customers, Producer agrees that he, she, or it shall be familiar with the provisions of all the Company's insurance contracts for the products that Producer is authorized to sell.

c. Producer shall attend any seminars or training sessions as deemed to be necessary by the Company, in its sole discretion.

d. Producer shall become familiar with and agrees to strictly observe and comply with any rules, regulations, policies, procedures, best practices, and requirements set forth from time to time by the Company.

e. Producer agrees to promptly make known and available to the Company all information which comes into

Producer's possession, custody, control, or knowledge at any time concerning the underwriting of any risk relative to any potential insured.

f.   Producer agrees to promptly make known and available to the Company all information which comes into Producer's possession, custody, control, or knowledge at any time concerning Producer's suitability to perform or failure to perform any provision of this Agreement.

g.   Producer, at Producer's cost and expense, agrees to keep in good standing all licenses, permits, registrations, and continuing education requirements that are required to solicit applications for insurance contracts to be issued by the Company.

h.   Producer shall ensure that any of Producer's employees that provide some or all of the Services are properly licensed to provide such Service.

i.   For each application of insurance, the Producer shall collect a signed bank draft authorization (to the extent permitted by Company) and shall promptly deliver all applications and documents to the Company in whatsoever manner the Company shall direct. Producer agrees that he/she is not authorized to collect or hold any funds for the Company and Producer shall not hold any funds of the Company.

j.   Producer agrees to keep complete and accurate records of all transactions related to this Agreement or the Services provided hereunder for a period of at least seven (7) years from the date of such transactions or longer if required by federal or state law or regulation.  Producer shall provide copies of such records to Company upon demand.  Company shall have the right, during normal business hours and with reasonable notice, to inspect, audit, and make copies from the books and records of Producer relating to the Services.

k.   The Producer shall not make recommendations to applicants to purchase insurance contracts in the absence of reasonable grounds to believe the purchase of such insurance contracts is suitable for the applicant. The procedure of determining whether the purchase is suitable shall include, but is not limited to, a thorough review and understanding of each applicant's financial situation and insurance needs, and a review of all proposals and applications for insurance contracts to the Company for completeness and correctness as to form and as to representations made by the applicant to the Producer in connection with same.

4.   **TERRITORY.** The Producer agrees to solicit applications for insurance only in territories approved by the Company in which the Producer and the Company are duly licensed, appointed, and authorized to conduct business. No territory is exclusively assigned by the Company to the Producer.

5.   **LIMITATION OF AUTHORITY.** All powers and authority granted to Producer by the Company are limited to those expressly provided under this Agreement, shall continue only during the duration of this Agreement, and shall terminate on the date that this Agreement terminates or is terminated.  Producer's authority to act on the Company's behalf shall exist only as expressly stated in this Agreement and not otherwise. No right, power, or authority for the Producer to act on the Company's behalf shall be implied. Specifically, but not in limitation of the foregoing, Producer agrees that Producer is without authority to do or perform - and expressly agrees not to do or perform - the following acts on Company's behalf: (a) incur any indebtedness or liability; (b) make, alter, or discharge any insurance contract or other contracts; (c) waive forfeitures; (d) quote rates other than as quoted by the Company; (e) extend the time for payment of any premium; (f) accept payment in cash or in a money order without holding said funds in trust for the Company and promptly remitting them to the Company; (g) guarantee dividends; or (h) deliver any insurance contract more than ten (10) days after issuance by the Company  or fail to promptly return the delivery receipt to the Company; (i) violate the insurance laws of any state in which Producer or his, her, or its employees, contractors, agents, or those acting on Producer's behalf  may be soliciting applications for insurance contracts; j) withhold any of the Company's, the insurance contract owner's, prospective insurance contract owner's, or applicant's monies or property; (k) rebate or offer to rebate all or any part of a premium on the Company's  insurance contracts; (l) induce or attempt to induce any of the Company's insurance contract owners to discontinue payment of premiums or to relinquish any insurance contract; (m) induce or attempt to induce or solicit any of other insurance producer to terminate their agreements with the Company; (n) perpetrate any fraud against the Company  or its  insurance contract owners, prospective insurance contract owners, or applicants; (o) fail to provide contract disclosure documents to insurance contract applicants as required by the Company or applicable law; (p) fail to provide compensation disclosures to insurance contract applicants as required by law; (q) violate any policies and procedures of the Company; (r) solicit the employment of or induce the termination of employment of any Employee of Company; or (s) any engage in any act with respect to or on behalf of the Company other than as expressly authorized herein.

6.   **COMMISSIONS.** During the term of, and subject to the provisions of this Agreement, and subject to the rules and regulations of the Company, the Producer shall be entitled, as full compensation for all of Producer's services and

expenses hereunder, those commissions as set forth in the applicable Producer Commission Schedule attached hereto and incorporated herein by reference, or as subsequently provided to Producer, as amended from time to time by Company in its sole and absolute discretion, on all business produced by Producer personally, less amounts due to the Company. Commissions shall be paid hereunder only for so long as the Producer is the insurance producer of record.  Commissions are subject to chargeback by the Company. The Company, in its sole and absolute discretion, may advance certain commissions to Producer, but shall be under no obligation to make such advances. The Producer specifically recognizes, accepts and agrees the Producer has responsibility for payment of any taxes levied by federal, state or local authorities as a result of compensation arising under this Agreement.   Upon the Producer's death, all vested commissions not otherwise held by the Company for the Producer's obligations (e.g., chargebacks, repayment of advances, etc.) will be paid to the Producer's estate, if Producer is a natural person.

7.     **COMMISSION CHARGEBACKS AND REFUNDS.** The Company, in its sole discretion, has the right to determine: (a) the status of each insurance contract, including but not limited to whether the insurance contract is or is not issued, withdrawn, cancelled, rescinded, returned during the free-look provision, lapsed for reasons other than death of the insured, void, and/or voidable, and; (b) whether to charge back any and all commissions paid to the Producer regarding the same. Any and call chargebacks are immediately due and payable by the Producer to the Company.

8.     **COMMISSION ADVANCES.** Producer agrees to immediately and upon demand, pay back to the Company any and all commission advances paid by the Company, and authorizes the Company to offset future commissions earned by the Producer. While any balance is outstanding for advances made by the Company, or for interest on such advances, all commissions earned on any insurance contract may be applied by the Company, in its sole and absolute discretion, to the repayment of such advances. All such advances made under this Agreement shall be secured by a lien in favor of the Company with respect the Producer's commissions from the submission of any and all insurance contracts by said Producer, and shall be individually guaranteed by the Producer and any owners of the Producer, if the Producer is an entity. The Company may, in its sole and absolute discretion, pay a net advance after reducing the gross advance for any chargeback or other Producer indebtedness.

9.     **PRODUCER INDEBTEDNESS TO COMPANY.** The Producer agrees that the Company may, at any time and in its sole and absolute discretion, offset against any advance, commissions due, or commissions to become due to Producer for any amount the Producer owes to the Company. The Company reserves the right to demand repayment of the Producer's balance owed to the Company at any time, upon which demand, the Producer agrees to promptly tender such balance to the Company.  Producer agrees that the Company may pursue collection of any said indebtedness. The Company reserves the right to delay collection of any balance owed to the Company and any delay of collection is not and shall not be construed as a waiver nor any other form of forgiveness of any balance owed by the Producer to the Company. Should Company terminate this Producer Agreement as a result of a debit balance which remains unpaid for more than 30 days, Producer agrees to forfeit all commissions due them under this Agreement.

10.    **TRANSFER OF COMMISSIONS.**  Producer shall not assign or transfer any commissions or other amounts due to Producer under this Agreement, unless approved in writing by the Company.  Such approval shall be at the sole and absolute discretion of Company.

11.    **EXPENSES.** The Producer shall pay all expenses incurred by Producer in the performance of this Agreement. Any such expenses not paid by the Producer may be offset by the Company, in its sole discretion, against any commissions payable to the Producer.

12.    **ADVERTISING & TRADEMARK.** The Producer may prepare and distribute advertising materials pertaining to the Company's insurance products, at the Producer's sole cost and expense; provided, however Producer agrees that he, she, or it will not and shall not distribute any such materials by any method whatsoever without first having filed identical copies of those materials with the Company and obtaining advance approval of those materials, in writing, by an officer of the Company.  The Producer recognizes that the Company retains a proprietary interest in any and all advertising material that uses the name of the Company, any trademark of the Company, or any of the Company's products, and agrees that any leads resulting therefrom shall be private and confidential and shall be subject to the Privacy provisions of this Agreement. Further, the Producer is prohibited from using Company trademarks and other intellectual property without first receiving written permission from the Company. The Producer further agrees to immediately surrender all materials referencing the Company or its products upon request or termination of this Agreement.

13.    **REPRESENTATIONS.** The Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf  agree that they will not represent the Producer as holding any professional or trade certification that implies expertise in financial matters relating specifically to persons age 65 or older, including but not limited to "certified senior advisor," until and unless the Producer provides the Company  with accurate information verifying  the nature of such certification and the Company approves, in writing,  the use of such certification in connection with the sale of the Company's products.

14.     **RESERVATIONS.** In addition to the other reservations by the Company in this Agreement, the Company also reserves  the following rights, in its sole and absolute discretion, without liability to the Producer to: (a) change commissions on any insurance contract form or rider upon furnishing notice to you, (b) withdraw any insurance contract forms; (c) change its premium rates; (d) reject insurance contract applications or premiums, to the extent authorized by applicable law, without specifying cause; and (e) unilaterally adopt policies and procedures from time to time relating to any matter not otherwise covered in this Agreement and to require Producer's compliance with those policies and procedures.

15.     **LIABILITY.** The Producer shall be jointly and severally liable, with each of Producer's owners, if Producer is not a natural person, to the Company for the payment of all monies, including, but not limited to, commission advances, due from the Producer, or debit balances on the account of the Producer, or debit balances resulting from advances to the Producer from the Company. The Company's books and records shall be prima facie evidence of such debit balances or advances due. The Producer hereby assigns to the Company, with recourse, all monies, including, but not limited to, commission advances, due from the Producer, or debit balances on the account of the Producer, or debit balances resulting from advances to the Producer from the Company as collateral for all such monies due or debit balance or advances. The Company may, in its sole discretion, at any time offset any debt or debts due from the Producer to the Company arising from Producer's transactions under this or any previous or subsequent Agreement against any commission or other compensation due or to become due Producer from the Company and any and all affiliates of the Company. The Producer agrees to promptly execute and return, upon request by the Company, all other documents required of Producer by the Company in order to properly evidence and effectuate such assignments, and to guarantee the legal enforceability thereof.

16.     **ASSIGNMENTS.** No assignment of any commission or any other monies, or any portion thereof due to or to become due the Producer hereunder shall be valid unless authorized in advance and in writing by an Officer of the Company. Any assignment of commissions so authorized shall be subject to any and all indebtedness of the Producer to the Company then existing or thereafter accruing. Producer shall not assign any of its rights or duties under this Agreement without the prior written consent of the Company, consent shall be withheld or granted in the Company's sole and absolute discretion.  The Company may assign or otherwise transfer this Agreement or any of Company's rights, duties, or interests arising under this Agreement in its sole and absolute discretion.

17.     **TERMINATION.** This Agreement shall terminate on the earliest of the following dates:

a.      The date of death, permanent disability, or incapacity of Producer, or the filing for dissolution, liquidation, bankruptcy, or insolvency of Producer;

b.      This Agreement may be terminated without cause by either party upon at least 10 days prior written notice, or immediately, upon written notice, for cause.  "For cause" in this regard means: a) the Producer's breach of any provision of this  Agreement; or b) that the Company has reason to believe that the Producer has engaged in wrongdoing including but not limited to the following: for: (1) withholding or embezzling Company funds, (2) fraud, misrepresentation, dishonesty or breach of fiduciary duty against or related to the Services, the Company or its contract holders, or misrepresentation or omission of information regarding the Company's products.  Upon termination for cause, Producer's right to all commissions or other compensation thereafter payable under this Agreement, under any prior agreement, and under any other agreements then in force with the Company may, in the Company's sole discretion, be terminated by the Company.

18.     **EFFECT OF TERMINATION.** Upon any termination of this Agreement, any and all of Producer's obligations to the Company shall mature, accelerate and become immediately due and payable in full, and Producer shall immediately, and without further notice, return to the Company any insurance contracts in Producer's possession and all other Company materials and Company property in the possession or under the control of Producer. Upon termination, Producer shall have no further authority to solicit business for the Company, or to represent the Company in any manner; but all other provisions of this agreement shall survive its termination.

19.     **LEGAL ACTION.** Producer has no authority to, and shall not, institute any administrative or legal proceedings on the Company's behalf. If the Company is a party to any administrative or legal action, or both, by reason of an alleged act, fault, or failure by Producer in connection with Producer's acts or omissions, the Company may, in its sole discretion, require the Producer to hire and pay an attorney designated by the Company, in its sole and absolute discretion, to represent the Company.   However, at the Company's option, and in its sole discretion, the Company may defend or institute any such action and expend such sums, including attorney fees, expenses and costs as may in the Company's judgment be necessary and the Producer agrees that it shall be liable for and shall reimburse the Company, immediately upon demand, for all such amounts.

20.     **INDEMNIFICATION.** Producer agrees to defend (with counsel selected by the Company in its sole and absolute discretion), indemnify and hold harmless the Company, its affiliates and their respective employees, officers, directors and shareholders from any and all claims, actions, liability, damages, expenses, and loss which arise from, result from, or relate to Producer's' real or alleged negligent, willful, or criminal acts, or the Producer's errors, omissions or breach

of any provision of this Agreement and such acts, errors, omissions or breaches of Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf, in the performance of Producer's duties under this Agreement. Claims, liability, or loss includes, but is not limited to, all costs, expenses, attorneys' fees and other legal fees, penalties, fines, actual, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible under the law of the state where any claim or suit is filed which seeks recovery of punitive damages against the Company) and any other expense or expenditure incurred by the Company. This indemnification will be in addition to any liability Producer may otherwise have.

21. **COMPLAINTS AND INVESTIGATIONS.**

a. Producer agrees to cooperate fully in any insurance regulatory investigation, inquiry, complaint, proceeding or assessment of regulatory discipline by or against the Company, and in any investigation with respect to any potential, threatened, or actual litigation or proceeding by or against the Company, including without limitation, that Producer agrees to promptly notify the Company in writing upon receiving notice of:

(1) any customer complaint pertaining to Producer or his, her, or its employees, contractors, agents, and those acting on Producer's behalf; the Company; or any insurance product marketed under this Agreement

(2) any potential, threatened, or actual litigation or proceeding related to Producer or the Company; and

(3) any regulatory inquiry, complaint or investigation, or assessment of any regulatory discipline with respect to this Agreement or any insurance product or other insurance-related activity pertaining to either the Company or any insurance product marketed under this Agreement.

b. Producer agrees to promptly provide the Company with a copy of all correspondence and documents in its possession regarding the matters set forth in this Section.

c. Producer agrees to promptly and fully respond to all inquiries from the Company regarding each of the matters set forth in this Section.

d. Upon request by the Company, the Producer shall provide a written response to the matters set forth in this Section, to the customer or regulatory authority involved but in no event may the Producer do so unless it first has provided that written response to the Company and has obtained prior written approval by the Company for transmission of the response to the customer or regulatory authority.

e. Upon request by the Company, the Producer shall promptly provide true and correct witness statements, affidavits, declarations or testimony related to each of the matters set forth in in this Section.

f. The provisions of this section shall remain in full force and effect regardless of any termination of this Agreement.

22. **CONFIDENTIALITY AND PRIVACY**. Producer shall treat as confidential all confidential information of the Company, including, but not limited to, all non-public information including proprietary information of the Company. Producer shall treat customer information as confidential as required by applicable law and by the Company, as described in the Company's privacy notices and in accordance with the Company policies and procedures. Producer shall also take reasonable steps to establish and implement administrative, physical and technical procedures and safeguards to ensure the confidentiality, security and integrity of customer information. Producer agrees to comply with the Company's terms of use, policies and procedures with respect to use of Company electronic systems providing access to customer information by Producer and his, her, or its employees, contractors, agents, and those acting on Producer's behalf, and Producer shall promptly report to the Company any breach of security related to such systems of which it becomes aware. Producer may use customer information only for the purpose of fulfilling Producer's obligations under this Agreement. Producer agrees to limit access to customer information to his, her, or its employees, contractors, agents, and those acting on Producer's behalf and other parties who need to know such customer information to permit Producer to fulfill its obligations under this Agreement and who have agreed to treat such customer information in accordance with the terms of this Agreement. Producer agrees not to disclose or otherwise make accessible customer information to anyone other than to the individual to whom the information relates (or to his or her legally authorized representative) or to other persons pursuant to a valid authorization signed by the individual to whom the information relates (or by his or her legally authorized representative), except as required for Producer to fulfill Producer's obligations under this Agreement, as otherwise directed by the Company, or as expressly required by applicable law. For purposes of this Agreement, "customer information" means information in any form that Producer obtained, had access to or created in connection with Producer's obligations under this Agreement regarding individuals who applied for or purchased insurance contracts, as well as client lists and information, contacts, leads, Company materials, insurance producer manuals, and records. Customer information includes nonpublic personal information, financial

information, and protected health information, as defined in applicable law. Customer information also includes, but is not limited to, information such as the individual's name, address, telephone number, social security number, as well as the fact that the individual has applied for, is insured under, or has purchased an insurance contract issued by the Company.

23.     **NOTICE.** Any notices required under the terms of this Agreement shall be sent, if to the Producer at the address set forth in the Producer's application for appointment (or as changed by Producer by giving notice in the manner set forth herein) or may be electronically delivered to Producer or made available to Producer.  Any notices to the Company required under the terms of this Agreement shall be sent via certified mail, return receipt requested, to the Company, at the address or at such other addresses as Company may from time to time designate to Producer. Any written notice to Producer required under this Agreement shall be deemed received one day following the date of mailing or delivery to Producer. Any written notice required under this Agreement to Company shall be deemed received, if sent properly addressed to Company by prepaid certified mail, return receipt requested, on the date actually received.

24.     **SEVERABILITY.** Any provision of this Agreement which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision contained herein, and such other provisions shall remain in full force and effect.

25.     **WAIVER.** The failure or forbearance or neglect of the Company to insist upon the strict performance of any provision of this Agreement or of any rule or regulation of the Company shall not be construed as a waiver thereof, but such provisions, rules and regulations shall continue to be in full force and effect.

26.     **ENTIRE AGREEMENT.** This Agreement and other written documents executed by the parties hereto, including the Producer/Agency Application for Appointment, Annualization Agreement, and Business Associate Addendum attached hereto, contain the entire agreement between the parties and there are no verbal representations, warranties, or agreements between the Parties of any kind whatsoever. This Agreement supersedes and replaces any and all other agreements between the Producer and the Company relating to the same matters. However, all financial obligations of the Parties to each other under any such prior Agreement(s), including debit balances, other debts, liens, rights to offset, and the obligation to pay commissions, still exist and will be combined and merged with similar obligations under this Agreement.

27.     **AMENDMENT.** No term or provision of this Agreement may be changed, waived, discharged or terminated orally.  Any change, waiver, discharge or termination of this agreement must be in writing, signed by the party against which enforcement of the change, waiver, discharge or termination is sought. No such modification, change or waiver of terms of this Agreement will bind the Company, unless it is in writing signed by an officer of the Company, and specifically expresses an intention to modify, change or waive terms of this  Agreement.  For the purposes of this Section, electronic mail messages shall not be deemed to be writings signed by the Parties.  Notwithstanding the foregoing, the Company may amend this Agreement by providing written or electronic notice of the amendment to the Producer ten (10) days or more before the amendment's effective date, and the amendment will automatically become effective without Producer's written agreement. Further, and notwithstanding the foregoing, the Company may also amend this Agreement immediately and without notice or Producer's agreement in order to comply with any applicable law effective as of the date specified in the amendment.

28.     **GOVERNING LAW AND FORUM.** This Agreement is made according to the laws of the State of Texas. The Parties expressly agree that this Agreement is governed by, and will be construed and enforced in accordance with, the laws of the State of Texas, without regard to its rules with respect to conflicts of laws. The forum for any dispute arising out of or related to this Agreement shall be the State of Texas. **VENUE FOR ANY DISPUTE ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL LIE SOLELY IN THE STATE AND FEDERAL COURTS LOCATED IN DALLAS COUNTY, TEXAS.  EACH PARTY AGREES TO SUBJECT ITSELF TO THE PERSONAL JURISDICTION OF THE FORUM AND SHALL NOT CONTEST SUCH JURISDICTION, THE VENUE OF SUCH COURT, OR THE CONVENIENCE OF THE FORUM.**

29.     **ATTORNEY'S FEES AND COSTS.** In the event that the Company refers any indebtedness of the Producer for collection, or in the event of litigation between the Parties arising out of or related to the performance or nonperformance of any obligation by the Producer to the Company, the Producer herein agrees that it is liable for and shall reimburse the Company for its costs, reasonable attorneys' fees, and expenses in connection therewith. This provision shall remain in full force and effect regardless of any termination of this Agreement.

30.     **JURY WAIVER. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY, IRREVOCABLY, AND INTENTIONALLY WAIVE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE PARTIES ENTERING INTO THIS AGREEMENT. THIS PROVISION SHALL REMAIN IN FULL FORCE AND EFFECT REGARDLESS OF ANY TERMINATION OF THIS AGREEMENT.**

31.    **AUTHORIZATION.** Each individual signing this Agreement warrants and represents that he or she has the full authority and is duly authorized and empowered to execute this Agreement on behalf of the Party for which he or she signs.

32.    **COUNTERPARTS/COPIES.** This Agreement may be executed in one (1) or more counterparts each of which shall be deemed to be an original, and all of which when taken together shall constitute one and the same instrument. This Agreement may also be executed electronically or via facsimile or e-mail, and electronic, facsimile and e-mail signatures shall be treated as originals for all purposes.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement effective _____06/12/2023_____.

**PRODUCER:**

☒ an individual, ☐ a partnership,
☐ a limited liability company,  ☐ a corporation

Muhammad Salman Ali Baloch
_____
*Printed Name*

_____
*Signature*

_____
*If a Corporation, State of Organization*

**LIBERTY BANKERS LIFE INSURANCE COMPANY and
its SUBSIDIARIES:**

Eric Johansson
_____
*Printed Name*

_____
*Signature of Officer*

COO
_____
*Title*

## GUARANTEE BY OFFICERS, MEMBERS, OR PARTNERS

**If the Producer is a business entity**, each of the undersigned, in consideration of the Company executing this Agreement, represents to the Company that the principal stockholders, members, or partners of the Agency, with their percentage of interest in the total ownership of the Agency, are as follows, and does hereby personally jointly and severally guarantee the performance of all terms, liability and responsibility for any default by Producer of an provisions, terms, conditions, and/or covenants of this Agreement and/or any amendments thereto.

| Signature | X _____ | Title _____ | % Interest _____ |
|---|---|---|---|
| Signature | X _____ | Title _____ | % Interest _____ |
| Signature | X _____ | Title _____ | % Interest _____ |
| Signature | X _____ | Title _____ | % Interest _____ |

**Exhibit**

**2**



1605 LBJ Freeway, Suite 700, Dallas, TX  75234  ●  Toll Free 800-731-4300

## PRODUCER TELEMARKETING ACKNOWLEDGEMENT

As part of Your contracting with Liberty Bankers Life Insurance Company and its Subsidiaries ("Company"), You are required to review and sign this Acknowledgement regarding telemarketing practices where a Company, Company service, or Company product might be mentioned or offered (including inbound calls from a lead vendor, texts, emails, faxes). All reference to "Seller" in this document means You, Your sub-producers, and Your lead vendor. "Call" means all attempted outbound telephone calls or texts, attempted telephone call transfers, and acceptance of telephone call transfers that involve or encourage the potential purchase of, or investment in, property, goods, or services.

Calls are subject to specific state and federal laws. Federal laws impose disclosure requirements, set permitted hours, and impose other conditions and restrictions. To the extent Seller engages in telemarketing Calls, or hires or permits others to do so on Seller's behalf, Seller must be aware of, and strictly comply with, all federal telemarketing laws and states telemarketing laws related to the Call. For example, the Telephone Consumer Protection Act ("TCPA") is the primary federal law that applies to Calls. The TCPA contains numerous restrictions on when, where, how, and to whom telemarketing Calls may be placed. The TCPA law and related regulations are complex. If Seller is unfamiliar with the TCPA, a good starting place is the Federal Communications Commission consumer website that can be found here: https://www.fcc.gov/tags/telephone-consumer-protection-act-tcpa. Please note that some states have additional consumer protections, if Seller is unfamiliar with state law, a good starting place is this compilation: https://tcpa.mobi/state-do-not-call-list/ and this resource: https://www.dnc.com/news/tags/state-laws. However, Seller should also check the state Attorney General's website for the telephone area code for the consumers who Seller attempts to contact (a good lead vendor will provide the consumer's area code before transferring a Call).

Seller should **never**: (1) use an automatic telephone dialing system; (2) use a pre-recorded message; or (3) Call numbers on a Do-Not-Call ("DNC") registry – there is a federal DNC registry, some states also have a DNC registry, and the Company has an internal DNC registry available to You on the Company producer portal (or you can request a copy from Compliance@LBIG.com). In some instances, Calls may be permissible if the person receiving the Call has given **prior express written consent**. However, it is Seller's responsibility to verify the prior written consent before placing a Call, transferring a Call, or accepting a Call transfer.

The TCPA also contains rules regarding the time of day Calls may be made and number of rings allowed or required on a Call. For example, companies must let Calls ring for at least 15 seconds or 4 rings, and must prohibit Calls before 9:00 am or after 8:00 pm local time in the consumer's location.

Seller must take complaints regarding marketing or unethical sales behavior seriously. You must investigate any complaints thoroughly, and, if a violation is discovered, terminate and, if necessary, take legal action against who is responsible for such violations.

By signing below, You hereby acknowledge, understand, and agree:

- As an independent contractor, it is Your sole and exclusive responsibility to ensure that Seller abides by all federal, state, and local laws, including telemarketing laws.
- Seller will ensure anyone who works for Seller understands and abides by these same rules.
- You and Your upline will indemnify and hold harmless the Liberty Bankers' company that Seller is acting on behalf of for any and all legal claims related to Seller's violation of consumer protection laws.
- Your contract may be terminated if Liberty Bankers becomes aware of Seller's failure to comply.

Muhammad Salman Ali Baloch
_____
*Insurance Producer or Entity Printed Name*

_____
*Insurance Producer Signature*

06/12/2023
_____
*Date*

Case 3:24-cv-00201-KC   Document 8   Filed 07/24/24   Page 55 of 69
Case 3:24-cv-00201-KC   Document 5   Filed 06/11/24   Page 1 of 2
Case 3:24-cv-00201-KC   Document 4   Filed 06/11/24   Page 1 of 2

**Exhibit**

**3**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas  ▼

|  |  |
|---|---|
| YAZMIN GONZALEZ | ) |
|  | ) |
|  | ) |
|  | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| LIBERTY BANKERS LIFE INSURANCE COMPANY | ) |
| an Oklahoma Corporation | ) |
|  | ) |
|  | ) |
| *Defendant(s)* | ) |

Civil Action No. EP-24-CV-00201-KC

SP
PSC37-03
6/19/24

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Liberty Bankers Life Insurance Company
c/o Northwest Registered Agetn Inc.
1999 Byan St,
Dallas, TX 75201

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Yazmin Gonzalez
Plaintiff, Pro se
14205 Charles Pollock Ave
El Paso, TX 79938

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: ____06/11/2024____    *Michael D. Trujillo*
                             *Signature of Clerk or Deputy Clerk*

Case 3:24-cv-00201-KC   Document 8   Filed 07/24/24   Page 56 of 69
Case 3:24-cv-00201-KC   Document 5   Filed 06/11/24   Page 2 of 2
Case 3:24-cv-00201-KC   Document 4   Filed 06/11/24   Page 2 of 2

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. EP-24-CV-00201-KC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

□  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

□  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

□  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

□  I returned the summons unexecuted because _____ ; or

□  Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                         *Server's signature*

                                              _____
                                                         *Printed name and title*


                                              _____
                                                         *Server's address*

Additional information regarding attempted service, etc:

JS 44  (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| YAZMIN GONZALEZ, | LIBERTY BANKERS LIFE INSURANCE COMPANY an Oklahoma Corporation |
| **(b)** County of Residence of First Listed Plaintiff  EL PASO *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant  DALLAS *(IN U.S. PLAINTIFF CASES ONLY)* NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* Pro se | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product   Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | Liability   [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &   Pharmaceutical | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| & Enforcement of Judgment | Slander   Personal Injury | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'   Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted | Liability   [ ] 368 Asbestos Personal | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and |
| Student Loans | [ ] 340 Marine   Injury Product | | [ ] 880 Defend Trade Secrets Act of 2016 | Corrupt Organizations |
| (Excludes Veterans) | [ ] 345 Marine Product   Liability | | | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** | | | (15 USC 1681 or 1692) |
| of Veteran's Benefits | [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | **LABOR** | | [x] 485 Telephone Consumer |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | Protection Act |
| [ ] 190 Other Contract | Product Liability   [ ] 380 Other Personal | [ ] 720 Labor/Management | | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal   Property Damage | Relations | | [ ] 850 Securities/Commodities/ |
| [ ] 196 Franchise | Injury   [ ] 385 Property Damage | [ ] 740 Railway Labor Act | | Exchange |
| | [ ] 362 Personal Injury -   Product Liability | [ ] 751 Family and Medical Leave Act | | [ ] 890 Other Statutory Actions |
| | Medical Malpractice | [ ] 790 Other Labor Litigation | | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure |
| [ ] 240 Torts to Land | [ ] 443 Housing/   Sentence | | | Act/Review or Appeal of |
| [ ] 245 Tort Product Liability | Accommodations   [ ] 530 General | | | Agency Decision |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty | | | [ ] 950 Constitutionality of |
| | Employment   **Other:** | **IMMIGRATION** | | State Statutes |
| | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | Other   [ ] 550 Civil Rights | [ ] 465 Other Immigration | | |
| | [ ] 448 Education   [ ] 555 Prison Condition | Actions | | |
| | [ ] 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
47 U.S.C 227

Brief description of cause:
Plaintiff received calls in violation of the TCPA

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$18,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  6/10/24
SIGNATURE OF ATTORNEY OF RECORD  *(signature)*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **YAZMIN GONZALEZ,** | § § § | |
| **Plaintiff,** | § § | |
| v. | § § | EP-24-CV-00201-KC |
| **LIBERTY BANKERS LIFE INSURANCE COMPANY** an Oklahoma Corporation | § § § § | |
| **Defendant.** | § § | |

## <u>COMPLAINT</u>

Pro Se Plaintiff Yazmin Gonzalez files this Complaint against Liberty Bankers Life Insurance Company for violations of the federal Telephone Consumer Protection Act ("TCPA") and its regulations alleging as follows:

## INTRODUCTION

1. In December 2023, Plaintiff began to receive a barrage of illegal telemarketing calls made on behalf of Liberty Bankers Life Insurance Company by an unknown anonymous telemarketer soliciting life insurance.

2. Plaintiff seeks redress under the TCPA, demanding that the calls stop.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Counts I under 28 U.S.C § 1331, because the claims arise under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (holding that federal courts have federal question jurisdiction over private actions brought under the TCPA).

1

4.  This Court has general personal jurisdiction over Defendant because Defendant's principal office is located in Farmers Branch, Texas.

5.  Venue is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES AND OTHER ENTITIES

6.  Plaintiff YAZMIN GONZALEZ ("Plaintiff" or "Gonzalez") is a natural person domiciled in Texas who received incessant and intrusive calls made on behalf of Liberty Bankers Life Insurance Company to market life insurance.

7.  Defendant LIBERTY BANKERS LIFE INSURANCE ("Defendant" or "Liberty") is an Insurance Company organized and existing under the laws of Oklahoma and can be registered via register agent Northwest Registered Agent Inc. at 1999 Bryan St, suite 900, Dallas, TX 75201.

8.  Unnamed Party Muhammad Baloch ("Baloch") is an insurance agent appointed and authorized by Defendant Liberty to market and sell insurance on behalf of Liberty.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

9.  In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10.  The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

2

11.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13.     Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

16.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

3

requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18.   *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19.   The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.   Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 − 52 (9th Cir. 2009).

21.   A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 − 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose

4

much of its force.")

## FACTUAL ALLEGATIONS

22.    Plaintiff successfully registered her phone number ending in -1859 on the National Do-Not-Call Registry ("DNC") in March 2022.

23.    The TCPA was enacted to protect consumers' privacy interests by prohibiting unwanted, repetitive, and invasive telephone solicitations.

24.    Baloch is a licensed insurance agent that was appointed by Liberty to market, solicit, and sell insurance on behalf of Liberty on August 11, 2023.

25.    Liberty appointed Baloch with the knowledge and expectation that Baloch would make phone calls to solicit Liberty's products and services.

26.    Liberty had the responsibility to ensure the agents Liberty appointed and authorized to solicit their products obeyed federal and state consumer protection laws.

27.    On or about December 8, 2023, Plaintiff began receiving such calls from Defendant to her El Paso-area cellular telephone number ending in -1859.

28.    Plaintiff received at least twelve (12) calls from a variety of spoofed phone numbers from telemarketers and direct Liberty employees soliciting life insurance on behalf of Liberty.

29.    Plaintiff answered call numbers #1 and #2. Plaintiff was then connected to a telemarketer who was soliciting for life insurance and did not properly identify himself or whom he was calling on behalf of. Each of the telemarketers identified themselves as calling on behalf of "Senior Benefits."

30.    On December 28, 2023, Plaintiff received call #3 from phone number 915-691-9079. Plaintiff was then connected to the same telemarketer who was soliciting for life insurance.

31.    Plaintiff was annoyed by the calls and pretended to be her mother "Norma" to ascertain who was behind the solicitation calls.

5

32.   The telemarketer asked qualifying questions and attempted to transfer the call but the call disconnected.

33.   The telemarketer called back from phone number 323-455-6636 (call #4). Plaintiff then was transferred to an agent who identified himself as "Muhammad Baloch" who did not identify the company he worked for.

34.   Agent Muhammad verified and asked qualifying questions to Plaintiff. Muhammad then informed Plaintiff he was going to transfer her to an agent from Liberty Bankers. The insurance agent completed the application.

35.   On or about January 5, 2024, Plaintiff received the life insurance policy in the mail and confirmed the solicitation calls were on behalf of Defendant Liberty Bankers.

36.   Liberty issued policy number 322911L and page 3 of the application included the signature of Muhammad Baloch. This is the same Baloch that Plaintiff spoke to on December 28, 2023.

37.   Plaintiff cancelled her insurance on January 23, 2024, and ended the established business relationship created when Plaintiff purchased the insurance policy as part of her investigation.

38.   On February 6, 2024, Plaintiff received a call from phone number 810-666-1315 (call #5). The telemarketer identified himself as "James from Liberty Bankers." Plaintiff informed the telemarketer she had already canceled the policy and to remove her from the call list. This was a DNC request.

39.   On February 14, 2024, Plaintiff received a phone call from phone number 810-666-1367 inquiring about why Plaintiff had canceled her insurance policy with Liberty. Plaintiff gave another DNC request.

40.   On February 14, 2024, Plaintiff received a phone call from phone number 224-223-8354. This phone call also inquired about why Plaintiff canceled her insurance policy with Liberty. Plaintiff gave another DNC request.

41.   Surprisingly the calls did not stop, from March 28, 2024, to May 6, 2024, Plaintiff received a total of 5 additional calls.

42.   Plaintiff received calls from various spoofed caller IDs from March 28, 2024, to May 6, 2024. The agents on these calls identified themselves as: "Clara from Liberty Bankers," "Adam from Liberty Bankers," and "Michael from Liberty Bankers." Plaintiff made DNC requests on each of these phone calls. The totality of the phone calls is listed in Table A below.

43.   Through information and belief, Clara, Adam, and Michael are employees of Liberty Bankers, as they expressly identified themselves as being "from Liberty Bankers."

44.   Liberty Bankers is directly responsible for the phone calls made by Liberty Bankers employees.

45.   Plaintiff did not have an established business relationship with Defendant, nor did Plaintiff consent to any of these calls.

46.   Plaintiff answered each call described in Table A. Every call Plaintiff answered was connected to a telemarketer who falsely identified the company they were calling on behalf of, as "Senior Benefits."

47.   TABLE A below displays calls to phone number ending in -1859 made to Plaintiff.

TABLE A:

| Number: | Date: | Caller ID: | Notes: |
|---------|-------|------------|--------|
| 1. | 12/08/23 | 860-544-6636 | Telemarketer soliciting for life insurance. |
| 2. | 12/27/23 | 915-799-4004 | Telemarketer soliciting for life insurance. |
| 3. | 12/28/23 | 915-691-9079 | Telemarketer soliciting for life insurance. |
| 4. | 12/28/23 | 323-455-6636 | Telemarketer transfer Plaintiff to Muhammad |
| 5. | 02/06/24 | 810-666-1315 | Do Not Call request |

| 6. | 02/14/24 | 810-666-1367 | Do Not Call request |
|----|----------|--------------|---------------------|
| 7. | 02/14/24 | 224-223-8354 | Do Not Call request |
| 8. | 03/28/24 | 512-649-3478 | Do Not Call request |
| 9. | 04/23/24 | 000-000-0000 | Clara from Liberty Bankers. Informed her I already canceled the policy. |
| 10. | 04/23/24 | 810-666-1315 | Adam from Liberty Bankers. Made another DNC request. |
| 11. | 04/23/24 | 512-649-0378 | Michael from Liberty Bankers.  Made DNC request. |
| 12. | 05/06/24 | 512-649-0378 | Michael from Liberty Bankers.  Made DNC request. |

48.   Defendants' placement of multiple calls within a twelve-month period to Plaintiff's residential phone line, listed on the National DNC Registry since March 2022, violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c).

49.   Defendants' violations described in paragraph 36 were knowing and willful because Liberty Bankers had "reason to know, or should have known, that [its] conduct would violate the statute." *Texas v. Am. Blastfax, Inc*., 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001).  Bad faith is not required.

50.   Liberty Bankers knew or should have known the requirements for making TCPA-compliant telemarketing calls and thus knew or should have known that the calls complained of herein violate the TCPA and its regulations.

51.   Liberty Bankers is well aware of the regulations regarding the TCPA and the ethical prohibition surrounding unsolicited direct advertising to consumers with whom no preexisting relationship exist.

### VICARIOUS LIABILITY OF LIBERTY BANKERS FOR TCPA VIOLATIONS MADE BY THE NON-LIBERTY EMPLOYEES

52. Liberty Bankers is "vicariously liable" under federal common law principles of agency for TCPA violations committed by third-party telemarketers." *In re Joint Pet. filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6582 (2013).

53. Liberty Bankers markets Life Insurance through direct telephone solicitation by its hired telemarketers, who act on its behalf. Telemarketer transfers live, hot leads to Liberty Bankers and Liberty Bankers accepts the leads. Telemarketers were Liberty Bankers's agent when it made the prohibited calls on behalf of and with the actual authority from, telemarketers pursuant to a contract that governs telemarketing for Liberty Bankers.

54. Liberty Bankers directs, controls, authorizes, and pays Telemarketers to generate live-transfer leads for Defendant Liberty Bankers's services through telephone solicitation.

55. Liberty Bankers sets the criteria for qualifying leads, which Telemarketers must follow, and telemarketers live-transfers leads qualified on those criteria exclusively to Liberty Bankers.

56. On information and belief, Liberty Bankers writes or at least approves the call script telemarketers use when qualifying leads for Liberty Bankers.

57. The telemarketers are Liberty Bankers's associates and do nothing to disturb the impression telemarketers work for and speak and act on behalf of Liberty Bankers.

58. The Telemarketers are Liberty Bankers's associates and do nothing to disturb the impression the telemarketers work for, speak, and act on behalf of Liberty Bankers.

59. From Telemarketers initial call through Defendant Liberty Bankers's acceptance of a completed life insurance application, the telemarketing of Liberty Bankers's services constitutes a singular, coordinated marketing effort devised, authorized, directed, and controlled by Liberty Bankers, the principal, with Telemarketers acting as Liberty Bankers's agent.

60.    Telemarketer, Co acting with actual authority, made the prohibited calls at the direct and control of Liberty Bankers, qualified Plaintiff according to Liberty Bankers's criteria, and then live-transferred Plaintiff to Liberty Bankers's advisor to continue marketing final expense life insurance policy.

### INJURY, HARM, DAMAGES, AND ACTUAL DAMAGES TO PLAINTIFF

61.    Plaintiff has been denied the use of her phone, enjoyment of his phone, and had the functionality of her phone decreased because of unnecessary charging, erosion of phone memory, and her privacy invaded by the harassing telemarketing calls.

62.    Defendants' calls harmed Plaintiff by causing the very harm that Congress sought to prevent a "nuisance and invasion of privacy."

63.    Plaintiff has been annoyed, harassed, and irritated by unauthorized calls placed on behalf of Defendants.

64.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone by placing unwanted telemarketing calls to Plaintiff.

### COUNT I
#### Violation of the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)

65.    Plaintiff incorporates by reference each and every paragraph of this complaint as if fully set forth herein.

66.    The TCPA prohibits telephone solicitation of residential telephone subscribers whose numbers are registered on the National Do-Not-Call Registry, 47 U.S.C. § 227(c)(5).

67.    Even though Plaintiff's number has been registered on the National DNC Registry since March 2022, Liberty Bankers made unsolicited telephone solicitations to Plaintiff's residential telephone

line, without Plaintiff's consent, and thereby violated 47 U.S.C § 227(c) and 47 C.F.R. § 64.1200(c) (the "DNC Violations").

68.     Plaintiff suffered the following injuries from each and every TCPA Violation:  invasion of privacy; intrusion on Plaintiff's right of seclusion; occupation of Plaintiff's telephone line by unwelcome calls, rendering the phone unavailable for legitimate calls; inconvenience; loss of usefulness of Plaintiff's phone; unnecessary expenditure of Plaintiff's phone's battery power; degradation of the battery; and trespass to Plaintiff's chattel, namely her cellular telephone.

69.     Under § 227(c)(5), Plaintiff is entitled to receive up to $500 in damages for each violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c).  Because the violations were knowing and willful, *see* Paragraphs 31-33, the Court may award up to $1500 per violation.

70.     Accordingly, Plaintiff seeks and order under Section 227(c)(5) awarding $1500 for each DNC Violation.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiff prays for the following relief:

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.     A declaration that actions complained of herein by Defendant violate the TCPA and Texas state law;

C.     An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.     An award of $1,500 per call in statutory damages arising from the TCPA § 227(c) intentional violations jointly and severally against the corporation for twelve (12) calls;

E.     An award to Ms. Gonzalez of damages, as allowed by law under the TCPA;

11

F.   An award to Ms. Gonzalez of interest, costs and attorneys' fees, as allowed by law and equity;

G.   Such further relief as the Court deems necessary, just, and proper.

June 11, 2024,                                             Respectfully submitted,

Yazmin Gonzalez
Plaintiff, Pro Se
14205 Charles Pollock
El Paso, TX 79938
915-820-1859

## I.   Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all claims so triable.

June 11, 2024,                                             Respectfully submitted,

Yazmin Gonzalez
Plaintiff, Pro Se
14205 Charles Pollock
El Paso, TX 79938
915-820-1859